**MERRITT–CHAPMAN AND SCOTT CORPORATION, a Delaware Corporation, Appellant**

**v.**

**GUNDERSON BROS. ENGINEERING CORPORATION, an Oregon Corporation, Appellee.**

**No. 17575.**

United States Court of Appeals Ninth Circuit.

June 19, 1962.

Moe & Kight, and Clifford O. Moe, Ephrata, Wash., Kizer, Gaiser, Stoeve, Layman & Powell, and John G. Layman, Spokane, Wash., Allen, DeGarmo & Leedy, and Gerald DeGarmo, Seattle, Wash., for appellant.

White, Sutherland & White, and William F. White, Portland, Or., and Sherwood, Tugman & Green, and Cameron Sherwood, Walla Walla, Wash., for appellee.

Before HAMLIN and MERRILL, Circuit Judges, and BEEKS, District Judge.

BEEKS, District Judge.

The appeal in this diversity case tests the correctness of the trial court's determination that there was evidence from which the jury could find that a contract existed between appellant (MCS) and respondent (Gunderson).

The material facts are substantially undisputed. Early in 1956, Public Utility District No. 2 of Grant County, Washington (P.U.D.), advertised for bids to construct Priest Rapids Dam on the Columbia River at Ephrata, Washington.[1]

---

1. Instructions to bidders gave notice (1) that the project was to be financed by the sale of bonds and thus no contract would be executed until a predetermined percentage thereof had been sold; (2) that each bidder should submit detailed drawings to the project engineer, Harza Engineering Company, who would have final say with respect thereto, including changes if deemed necessary, such changes being without cost to P.U.D.; (3) that the final contract would contain a bonus-penalty provision of $1,300.00 and $3,000.00 a day, respectively, with 1900 days from commencement being the crucial date; and (4) that construction or fabricating work done prior to approval of drawings would be at contractor's risk.

Prior to March 10, 1956, MCS informed Gunderson that it was preparing to bid as general contractor on Priest Rapids Dam. MCS requested Gunderson to bid on several parts of the project, including Items 8.1 and 8.6, which concerned spillway and draft tube gates.[2]

In response to this request, Gunderson on March 10, 1956, submitted a written quotation which was, so far as material here, substantially as follows: Item 8.1: Deliver F.O.B. barge, nearest navigable point to job site, 22 spillway gates, less hoists, anchorages and embedded materials for the lump sum price of $1,093,-004.00. Item 8.6: Deliver in same manner 6 draft tube gates for a price of $80,-032.00. Under each heading, there was also a lesser figure for rail delivery.[3] The quotation provided that prices would be based upon current shop labor rates and material costs; any increase in either would be charged to the account of the purchaser; delivery was to be contingent upon availability of steel; MCS was requested to assist in procuring steel if such became a problem; and finally, the quotation stated that Gunderson would not be accountable for increases in costs, if any, due to changes in design made by P.U.D.[4]

In bidding the prime job, MCS used the quotation submitted by Gunderson.

Further, it named Gunderson as the supplier of *all* of the equipment specified in Items 8.1 and 8.6, plus frames and guides for Item 8.6 (draft tube gates). When the project bids were opened on March 12, 1956, in Ephrata, MCS was low bidder for construction of the dam which fact, together with the fact that Gunderson's bid had been used by MCS, soon became known to Gunderson.[5]

On March 26, 1956, Mr. Meyers of MCS called Mr. Howe of Gunderson, saying: "As you probably know by now, your name [Gunderson's] was used in our bid for furnishing of the spillway gates for the Priest Rapids project." There was additional conversation concerning those parts of Item 8.1 that Gunderson had omitted in its quotation. MCS was particularly interested in having Gunderson supply the hoists which were to be utilized in opening and closing the spillway gates. Howe informed Meyers that Gunderson could supply hoists but only through another company, that is, Gunderson woulld purchase the hoists and resell them to MCS for a reasonable profit. Further, Howe said that the hoists would have to be considered separate and apart from the spillway gates.

Gunderson contends that this conversation constituted acceptance of its bid.

2. Item 8.1 called for a lump sum price on "the design and manufacture of twenty-two (22) spillway gates and hoists; consisting of twenty-one (21) spillway tail gates and one (1) tainter sluice gate, each complete with seals, guide rollers, guides and anchorages, including the pre-stressing cables, their fittings, the rigid conduit in which they are to be placed and all necessary equipment required to pretension and measure the stresses in the prestressing cables in the field, and the hoisting equipment for the gates."
   Item 8.6 asked for a lump sum price on six (6) draft tube gates.

3. Gunderson quoted water delivery prices exclusively to MCS. Prior to the bid, it had been mutually determined that while rail delivery was cheaper, water delivery would save several times the difference in MCS's erection costs.

4. It is apparent that on March 10 Gunderson did not propose to furnish all of the equipment upon which MCS requested a bid. There is testimony in the record to the effect that due to the short amount of time in which Gunderson had to prepare its bid, it was unable to marshal data with respect to those items not quoted. There is also testimony to the effect that MCS wanted one sub-contractor to provide and be responsible for the entire spillway gate system, the apparent reason being that MCS would have to guarantee the job and wished to have responsibility unified as much as possible.

5. Mr. Jenks, Project Manager for MCS, advised a Captain Lew Russell, Jr. of these two facts on March 12, 1956. Gunderson was so informed by Captain Russell. There was nothing secret about these facts and the information was generally known by those interested in the project.

Shortly after this communication, Gunderson was also requested to quote figures on trunnion anchorages for the spillway gates. Gunderson eventually supplied this quotation.

In early June, Howe of Gunderson telephoned Mr. Owens of MCS and asked for a letter of intent which was to assist Gunderson in acquiring steel. Because any such letter would necessarily be contingent upon award of the prime contract, it was determined that the matter be dropped for the time being. Howe was also advised some time later that purchase orders, when ready, would be issued from the Ephrata office of MCS. This conduct is alleged as an alternative instance of acceptance by MCS.[6]

On July 9, 1956, the prime contract between MCS and P.U.D. was executed. Incorporated therein were the bids made by Gunderson to MCS on Items 8.1 and 8.6. Gunderson was named as supplier of *all* of the equipment in the two items plus frames and guides for Item 8.6, although it had only offered to supply part thereof. Gunderson also urges this circumstance as an acceptance by MCS.

By this time it became important for MCS to finalize arrangements with its suppliers. Jenks of MCS met with Howe to discuss the question of hoists, anchorages and embedded material which had been omitted in Gunderson's initial quotation. The subject of escalation was also discussed. A series of negotiations followed concerning these subjects with proposals being made by each side.[7]

On August 10, 1956, Gunderson was advised that the spillway gate orders were placed with another supplier. Shortly thereafter, Mr. A. E. Gunderson, Vice President of Gunderson, wrote to MCS reviewing the facts and requesting reimbursement for the expenses incurred in preparing its bid. In his letter, Mr. Gunderson neither insisted nor inferred that a contract for Items 8.1 and 8.6 existed between the parties. No mutually satisfactory arrangements having been made, this litigation followed.

The jury found for Gunderson and assessed its damages at $98,398.10. This appeal is taken from the final judgment entered thereon and from denial of MC S's motion for judgment notwithstanding the verdict and in the alternative for a new trial.

The principal thrust of the appeal by MCS is twofold: First, that Gunderson's quotation of March 10, 1956, was not a legal offer because of indefiniteness, and second, that even if the offer be considered valid, it was never accepted. For the purpose of further discussion, we assume, arguendo, that the offer was capable of being accepted.

Gunderson's argument for acceptance is quadrigeminal: (1) Use of its bid by MCS, plus unsolicited communication of that fact, (2) use of its name and bid by MCS in the prime contract between MCS and P.U.D., (3) conduct by MCS with respect to the proposed letter of intent and purchase order, and (4) publication by MCS of the fact that MCS used the bid.

Offer and acceptance are the tools by which courts and contract negotiators arrive at the illusive contractual concept of "a meeting of the minds." The query is uniformly: Did the parties agree upon the same thing at the same time? It is our opinion that in this case they did not.

█ At the outset, it is clear that in Washington use of a bid by a prime contractor is not the legal equivalent of ac--

---

6. With respect to purchase orders, on July 30, 1956, either Meyers or Owens told Gunderson: "It looks like you people have the job. However, the purchase order will come out of the field office and we are disappointed you didn't bid on hoists."

7. MCS wanted a firm price on the items in question. Gunderson offered to eliminate escalation but insisted on an increased overall price in return. Additions to Item 8.6 were discussed and bids therefor were submitted. The meaning of "embedded materials" was discussed and the cost of adding this item to the bid was submitted by Gunderson. Gunderson offered to split the added cost with MCS..

ceptance. Milone and Tucci, Inc. v. Bona Fide Builders, Inc., 49 Wash.2d 363, 301 P.2d 759. In that case, a sub-contractor submitted a bid which was used by the prime contractor in its bid on a Government building project. Thereafter the sub-contract was awarded to a third party. The court reversed a judgment in favor of the sub-contractor for breach of contract, saying at page 368, 301 P.2d at page 762:

"Did defendant's use of plaintiff's offer, in its bid upon the prime contract, constitute an acceptance thereof, conditioned only upon the prime contract being awarded to defendant? We think not."

Thus, mere use of Gunderson's bid was not an acceptance thereof.

■■ In addition, the *manner* of use by MCS negates the conclusion that such amounted to acceptance. To constitute acceptance, an offeree's manifestations of assent must be strictly within the terms of the offer.[8] The facts here indicate something which materially differs from this basic requirement. When MCS submitted its bid to P.U.D. it named Gunderson as supplier of "Spillway Gates and Hoists," "Draft Tube Gates," and "Frames and Guides for Draft Tube Gates." Gunderson's bid, however, merely offered to supply spillway gates *"less hoists and anchorages"* and "draft tube gates" with no mention of frames and guides therefor. "Embedded material," the meaning of which caused some disagreement, was specifically excluded. Such use by MCS was clearly without

the terms of the offer. Use of Gunderson's name in the prime contract is of no greater significance, and such conduct by MCS likewise falls short of acceptance. Again, MCS added to the offer by reciting that Gunderson would supply "structural anchorages." In short, Gunderson offered to supply a portion of Items 8.1 and 8.6. Use of that offer by MCS, viewed in its most favorable light, indicates nothing more than that acceptance would only be on some basis other than the offer.

■ The further contention that MCS "promised" P.U.D. that Gunderson would supply these items is also without merit. Gunderson makes no claim on the theory of third party beneficiary, and such a claim could not be sustained in law. It was not the intention of MCS and P.U.D. to benefit Gunderson by their contract and such intention is one of the elements which a purported third party beneficiary must show to establish his status as such. Pacific Mercantile Agency v. First National Bank of Ferndale, 187 Wash. 149, 60 P.2d 6.

■ Gunderson also invites this court to hold that the unsolicited communication of March 26, 1956, advising Gunderson that its bid was used, is a circumstance which carries this case beyond the restrictive confines of the Milone case, supra. We decline to so hold. Communication of a fact, unsolicited or otherwise, which does not amount to acceptance, cannot, by virtue of such communication, become an acceptance. Also, what Gunderson "understood" from the con-

8. The basic rules governing requisites of acceptance have been well defined by the Supreme Court of Washington. A concise summary thereof, together with exhaustive authority, is found in Contracts in Washington 1937–1957, Vol. 34, Wn. L.Rev. p. 42:

"The principle which demands of an offeree precise and literal compliance with the requirements of the offer is generally and in Washington thought to be both fundamental and inflexible. Nothing else or less can be an acceptance; the power created by an offer is a strictly limited one, to be exercised only within the confines of the offeror's request. If the

offeror asked for a promise, he is entitled to exactly that promise in unequivocal language (or to seasonable rendition or tender of the offeree's performance); if he asks for an act, he is entitled to exactly that act. An offeree who chooses to respond in some other way may in doing so make a counter-offer; he does not accept. Negotiations, however protracted, come to nothing if the parties cling to positions which never coincide."

See, also, St. Paul & Tacoma Lumber Co. v. Fox, 26 Wash.2d 109, 173 P.2d 194; Schuehle v. Schuehle, 21 Wash.2d 609, 152 P.2d 608.

versation can have no greater legal significance than that which is revealed by the actual transactions between the parties. The conversation of March 26, 1956, must be viewed in its entirety and the only inference possible is that the parties were still bargaining.

 Gunderson further contends that certain conversations relating to a "promised" purchase order and letter of intent constituted acceptance of its bid. No such documents were ever forthcoming. A promise to contract, or a promise to place an order in the future, is certainly nothing more than negotiation. Owens-Corning Fiberglas Corporation v. Fox Smith Sheet Metal Company, 56 Wash.2d 167, 351 P.2d 516. It is noteworthy that in the Owens-Corning case, the sub-contractor (who, vis-a-vis the present situation, was being sued for breach) had already rendered part of the required performance. Gunderson's reverse argument that the purchase order was merely meant to "formalize" the bargain which was struck on March 26, 1956, falls of its own weight in view of our prior discussion. Of the proposed purchase order and letter of intent, we can say that conversations in reference thereto indicated, at best, nothing more than an intention on the part of MCS to contract with Gunderson at some future date.

Finally, Gunderson contends that MCS accepted its bid when it "told the world" that Gunderson's bid figures were used. For reasons previously mentioned, this argument is untenable.

This case bristles with indicia of negotiation. In the very first instance of contact between the parties after the offer was made, MCS proposed an arrangement considerably different than that which was submitted by Gunderson. From that point on, all further contact between the litigants came to nothing more than offers and counter-offers. M CS certainly manifested an intention to enter into a contract with Gunderson at some time in the future, and MCS may very well have taken advantage of Gun-

derson, but contract with Gunderson it did not.

The motion for judgment notwithstanding the verdict should have been granted, and the complaint should have been dismissed.

Reversed.