Abbie F. EVANS, by Spencer J. Evans, the duly appointed and acting Committee of her person and property, Plaintiff-Appellee,

v.

S. J. GROVES & SONS COMPANY (incorporated State of Minnesota), Defendant-Appellant.

Spencer J. EVANS (a resident of Oneida County, State of New York), Plaintiff-Appellee,

v.

S. J. GROVES & SONS COMPANY (incorporated State of Minnesota), Defendant-Appellant.

Nos. 142 and 143, Dockets 27737 and 27738.

United States Court of Appeals
Second Circuit.

Argued Dec. 3, 1962.

Decided March 20, 1963.

Bartle Gorman, Utica, N. Y., for defendant-appellant.

George Kohn, Remsen, N. Y., for plaintiffs-appellees.

Before SWAN and FRIENDLY, Circuit Judges, and DIMOCK, District Judge.*

FRIENDLY, Circuit Judge.

These appeals by an out-of-state defendant from judgments of the District Court for the Northern District of New York in two negligence actions brought by in-state plaintiffs present a number of close questions, mainly of New York law. We have concluded to affirm.

The evidence amply supported the following version of the accident and its immediate sequelae—a version which, indeed, has not been seriously questioned either below or here. On December 10, 1954, one of the plaintiffs, Mrs. Abbie F. Evans, aged 57, was a passenger in the front seat of a farm truck traveling north on a two-lane highway in Oneida County, New York. Her neighbor, Roy Clemons, owned the truck and was driving it; his wife, Jane, sat between Roy and Mrs. Evans. There was slush and snow on the pavement; this was bare in some spots and slippery in others. It was dusk, a little after 5 P.M.; the farm truck had its lights on and was equipped with chains. It was well on the right side of its own lane, indeed with its right wheels on the shoulder, as it traveled uphill at 25 m. p. h. or less. Appellant Groves' truck was coming downhill, having rounded the upper portion of an

"S" curve. It was in a skid, and as it slipped sideways, it "slew[ed] around" to the left side of the road, with the result that its left rear wheel hit the left front of the Clemons truck. The Groves truck then "bound over" onto its proper side of the road again, and came to a stop some distance beyond the point of impact. The impact cracked the windshield and caused damage to the front end of the Clemons truck, which had to be towed to a garage for repairs; it also lifted Mrs. Evans out of the seat and caused her head to strike the windshield, resulting in a bump on the top of her head one-half to three-quarters of an inch high and two and one-half to three inches long. Neither of the Clemonses was hurt. On December 14 Mrs. Evans consulted Dr. Redmond, her local physician, and, according to the doctor's testimony at the trial, "complained of feeling dizziness, having fainting spells, having blinking spells of vision with her eyes and getting tired after visiting the day before." Mrs. Evans had previously complained to Dr. Redmond of dizziness, grogginess, and other difficulties and, as recently as November 29, 1954, of false and defective hearing. Although Mrs. Evans "also made note that she had been worrying over a head injury she had received in an accident * * * on December 10," Dr. Redmond's records and testimony do not indicate that on the occasion of her December 14 visit either his patient or he attached much significance to this.

On January 5, 1955, Ryan, a representative of defendant, called at the Clemonses' home to discuss their claim for damage to the farm truck. Having ascertained the amount and manifested a willingness to pay it, Ryan indicated that a release would have to be obtained from Mr. and Mrs. Evans. The Evanses were summoned by telephone and came right over. When they arrived, Ryan asked Mrs. Evans if she felt "any bad effects" from the accident; she answered in the negative. When the Evanses inquired why they should sign the proffered

release, Ryan answered, "so Clemons could get the money to get the car out of the garage." They thereupon signed. Although the release, which bears the initials "L. S." after each signature, contains the usual useless recitation of a consideration of $1, nothing was actually paid to the Evanses; under N. Y. Personal Property Law, McKinney's Consol. Laws, c. 41, § 33, subd. 2, however, this is no reason for invalidating the instrument. The release recites that the signers "understand that liability is denied by said S. J. Groves & Sons Co. who has made no agreement or promise to do or omit to do any act or thing not herein set forth, and * * * that this release is to compromise and terminate all claims for injuries or damages of whatever nature, known or unknown, including future developments thereof, in any way growing out of or connected, or which may hereinafter in any way grow out of or be connected with said accident." Although Mr. Evans testified that he did not read the release before signing it, when he was asked the question, "[Y]ou knew when you signed and when Mrs. Evans signed that you were discontinuing any claim against the owner of the truck that was involved with Mr. Clemons' truck, [and] that was your intention in signing it?," he answered in the affirmative.

Two weeks later Mrs. Evans again saw Dr. Redmond and complained of head symptoms. From that time on her condition became progressively worse, and there ensued a long history of examinations, consultations, surgery and hospital care, the latter taking place at the Faxton Hospital in Utica, the Albany Medical Center, and, since May 13, 1955, at the Marcy State Hospital, an institution for the mentally ill, where Mrs. Evans was confined at the time of the trial as a legally-adjudged incompetent. As to the nature and cause of her ailment, suffice it here to say that the plaintiffs' theory in these two actions—one by Mrs. Evans through her husband as her Committee, and the other by the husband for loss of services—was that her suffering was due to a thrombosis of the left lateral sinus and that that condition, in turn, was due to the collision with defendant's truck; there was adequate evidence to warrant a jury's finding to this effect—although, as is usual in such cases, there was also adequate evidence to support a contrary decision on either of the two necessary causal factors.

Judge Brennan conducted a preliminary trial without a jury on the issues raised by the defense of release and, in a memorandum decision, found that the release was executed under a mutual mistake of fact on the part of the Evanses and thus was not a bar to their actions. Subsequent trial of the merits resulted in verdicts for $10,910 in Mrs. Evans' action and for $16,180 in her husband's. Defendant's appeals challenge (1) the setting aside of the release, (2) the sufficiency of the evidence of negligence to warrant submission to the jury, (3) the judge's refusal to give a requested charge on the issue of negligence, and (4) an answer by the judge to the jury's request for a further instruction on causation.[1]

## I. VALIDITY OF THE RELEASE.

As the judge found, "Both plaintiffs were mature middle aged persons and there is no claim of lack of intelligence or understanding on their part or overreaching on the part of the defendant." The evidence was uncontradicted that before the Evanses signed the release Ryan had explained its effect to them, had inquired whether Mrs. Evans was injured, had received a negative response from her and her husband, and had even suggested that she see a doctor, to which she replied that it was not necessary. The judge thus correctly concluded that the only basis that would warrant refusal

---

1. Appellant also questions the sufficiency of the medical evidence to support the diagnosis relied on by plaintiffs, but we do not regard this as requiring discussion beyond that incident to our treatment of the issue raised by the judge's answer to the jury's request for a further instruction on causation.

to give effect to the release would be mistake; he held the evidence before him showed a mistake that would entitle plaintiffs to have the release set aside under New York law.

The opinion of the New York Court of Appeals most frequently cited in cases of this sort is Farrington v. Harlem Savings Bank, 280 N.Y. 1, 3, 19 N.E.2d 657 (1939). Farrington had executed a release for $30 when he knew only that he had suffered "a scalp wound and some bruises"; later it turned out that a bone in his left arm had been fractured, with consequent loss of use. On appeal from a judgment dismissing the complaint on the basis of the release, the Court of Appeals reversed. However, the Court relied not on Farrington's ignorance of the internal injury but rather on evidence that he had not read the release before signing it and had been told by the claim agent that it was merely a receipt. Judge Hubbs stated:

"No doubt the plaintiff had a perfect right to agree to settle for the injuries which were known and for all other injuries which might result, and such an agreement would be binding upon him no matter how serious the result of the injuries might thereafter turn out to be, provided the agreement was fairly and knowingly made."

█ If the sentence had not included the proviso, the instant case, and many others, would be clearly ruled for defendants. However, the sentence did include the proviso, and the New York courts have devoted much effort to elucidating it. In that process, they have thought it useful to say, among other things, that "When the settlement is made on the assumption of the existence of a state of facts, it may be rescinded if that state of facts does not presently exist," but that "Where * * * there is no mistake concerning the injuries but only a miscalculation of consequences, the voluntary settlement of the parties is irrevocable as to both." Mack v. Albee Press, Inc., 263 App.Div. 275, 277, 32 N.Y.S.2d 231, 233 (1st Dept.), aff'd, 288 N.Y. 623, 42 N.E.2d 617 (1942). This language is not too helpful in determining whether, if an impact causes both an external injury that had become manifest before the time of the release and an internal one that had not yet become so, the case is one of mistake as to the existence of a present injury, so that the release may be set aside, or merely one of miscalculation as to the consequences of a known injury, so that it may not be.

Although the New York cases do not yield an assured conclusion, they suggest to us that the former answer is the correct one, at least when, as here, the circumstances negate a considered decision to arrive at a fair liquidation of all injuries, including those which were unsuspected. A case especially persuasive is Brown v. Manshul Realty Corp., 271 App. Div. 222, 223, 63 N.Y.S.2d 1, 2 (1st Dept.), aff'd, 299 N.Y. 618, 86 N.E.2d 179 (1949). This applied the formula quoted from the Mack decision to set aside a release where the plaintiff thought he had received only superficial injuries at the time he signed the release in return for $150, but actually had sustained a fractured clavicle and dislocated joint. See Record, 10. Both the Appellate Division and the Court of Appeals evidently thought the case different from Mack, where the plaintiff knew the full present extent of the bruise to his toe at the time he settled for $275, and had been warned by his physician of the peculiar gravity the bruise might have to him because of his diabetes; his asserted "mistake of fact" in not being aware that the bruise would result in gangrene and in amputation of his leg could thus be characterized as a "miscalculation of [the] consequences" of a known injury. The Court of Appeals must likewise have regarded the Brown case as distinguishable from Yehle v. New York Central R. R., 267 App.Div. 301, 46 N.Y.S.2d 5 (4th Dept. 1943), aff'd, 295 N.Y. 874, 67 N.E.2d 516 (1946), which is similar to the instant case in some respects, but quite dissimilar in others that we deem con-

trolling. There a release was held to preclude recovery for an injury to the pituitary gland unknown to the parties at the time of settlement; the plaintiff did know she had suffered serious lacerations, fractures and vaginal bleeding, for which she had been hospitalized for three months at the defendant's expense. The release was not executed until five months after the accident, and then after much discussion of plaintiff's injuries and for a payment of $9,000 in addition to the hospital expenses, which were estimated at more than $3,000. The circumstances thus clearly pointed to a desire on the part of both sides to make a fair and final disposition of the claim. Such a situation differs markedly from the present one, where the Evanses signed the release after a few minutes' discussion in order to help their neighbors collect for the damage to the latters' truck and with no consideration whatever to themselves.

■■ No useful purpose would be served by discussion of the many other New York cases we have reviewed, including such recent ones as Duch v. Giacquinto, 15 A.D.2d 20, 222 N.Y.S.2d 101 (3d Dept. 1961); Acevedo v. City of New York, 15 A.D.2d 899, 225 N.Y.S.2d 584 (1st Dept. 1962), and Gallo v. Montenigro, 17 A.D.2d 935, 234 N.Y.S.2d 490 (1st Dept. 1962); it is sufficient to say that we find them in general accord with Professor Corbin's statement, 6 Contracts (1962) 181–82:

> "If a claim is made for damages for an injury, a compromise settlement is ordinarily not made voidable for mistake because the injury was greater and lasted longer than was expected at the time of the settlement, if the parties knew or had reason to know that the extent of the injury was uncertain and that was the very reason for the compromise. But, if the settlement was made in contemplation of one kind of injury, minor in character such as a flesh bruise, when in fact but unknown

> to the parties, there was a very different injury such as a broken back, the settlement or release may be voidable for mistake."

See also 3 Corbin on Contracts (1960), at 587–88; Keefe, Validity of Releases Executed under Mistake of Fact, 14 Fordham L.Rev. 135, 146–47 (1945). We add only that despite the statement in Moses v. Carver, 164 Misc. 204, 210–211, 298 N.Y.S. 378, 385 (Sup.Ct. Broome County, 1937), anent Harvey v. Georgia, 148 Misc. 633, 266 N.Y.S. 168 (Sup.Ct. Tompkins County, 1933), where the court had set aside a release on facts strikingly similar to those here, we do not find that, under the New York decisions generally, relief against mistake because of unknown injuries can be cut off simply by inserting sufficiently broad language in the release. This is hardly surprising; unless the release included unknown injuries by its terms, the plaintiff would prevail as a matter of interpretation and without need for resorting to equity for relief. The language of the release in the Brown case was every bit as strong as that here. It was headed, in bold face type, "GENERAL RELEASE OF ALL LIABILITY FOR Injuries, Damages and Losses, Both Known and Unknown"; and it recited that "claimant desires, at this time, and without further delay, amicably to compose, adjust and forever settle all disputes and controversies pertaining to said liability and to all said injuries, damages and losses, even though the nature, extent, duration or seriousness of claimant's injuries, damages or losses may not now be fully known, claimant being willing to assume all risk, chance or hazard that claimant may have injuries, damages or losses which are now unknown or that claimant's known injuries, damages and losses may become more serious, more extensive or greater than is now known, anticipated or expected." Record, 55. Nevertheless the release was set aside on the basis that although this was what the release said, it was not said "knowingly" in the light of what developed. See Keefe, supra, at 147.

However, this reading of New York law does not settle the issue of the release in plaintiffs' favor. For defendant cites evidence to refute the factual finding that plaintiffs were unaware when they signed the release that Mrs. Evans had suffered anything more than a contusion. Since Mr. Evans testified at the hearing on the validity of the release that he knew his wife had consulted a doctor between December 10 and January 5, the judge was wrong in finding, in his memorandum written after this hearing, that "Mrs. Evans did not consult a physician." But since a visit to the physician whom she had been seeing regularly before the accident would alone be quite inconclusive, and since defendant succeeded in having stricken Mr. Evans' statement that his wife complained to Dr. Redmond of headaches when she saw him after the accident, the judge was warranted, on the evidence before him at the time, in his more general findings that Mrs. Evans "evidenced no indication of injury other than the bump above referred to, evidence of which disappeared within a comparatively short time," and that when the release was signed, "The parties involved were unaware of Mrs. Evans' underlying injury * * *." At the subsequent trial on the merits, Dr. Redmond elaborated on Mrs. Evans' December 14 visit as above described, noting that she complained of fainting and dizziness and was worried about the head injury received in the accident, and Milfred Evans testified that by Christmas time he "could make quite an observation of the change" in his mother—"She used to lay down to sleep, which was very unusual. She said she felt tired all the time and from Christmas on to the last day of December she was gradually getting worse every day, as far as I could see." If this testimony had been before the judge at the preliminary trial, it might well have affected his determination as to the plaintiff's knowledge of the underlying injury on January 5. Whether if he had nevertheless found that both or either of them did not know of it, this ruling would have been "clearly erroneous" under F.R.Civ.Proc. 52, is another question, but one we are not called upon to answer. It was open to defendant to bring to the judge's attention the bearing of the further testimony given at the trial on the merits; indeed, the memorandum concluding that the release was not a bar had stated that "a judgment to the above effect will be entered at the time of the entry of the judgment which determines the merits of these actions * * *." But defendant did not do this, either during the trial or afterwards. We are not required to reverse because there lurks in the record certain testimony relevant to an issue other than that on which it was offered, where such relevance was not brought to the attention of the trial judge. See Fitzgerald v. United States Lines Co., 306 F.2d 461, 468 (2 Cir., 1962), cert. granted to review another point, 371 U.S. 932, 83 S.Ct. 307, 9 L.Ed.2d 269 (1962).

## II. SUFFICIENCY OF THE EVIDENCE OF NEGLIGENCE.

Defendant's skid appears to have propelled us into one of the most slippery areas of New York tort law—as witness the three opinions written on the subject by distinguished Justices of the Appellate Division for the First Department in a quite similar case, Lo Piccolo v. Knight of Rest Products Corp., 7 A.D.2d 369, 183 N.Y.S.2d 301 (1959), aff'd, 9 N.Y.2d 662, 212 N.Y.S.2d 75, 173 N.E.2d 51 (1961), which curiously has not been cited to us by either side.

What is involved is the alleged rule that "skidding alone is no evidence of negligence." See Greyhound Corp. v. Salvation Army, 252 F.2d 331, 332 (2 Cir., 1958). In the present case the testimony of Mr. Clemons, of which more below, constituted virtually the sole evidence on the issue of defendant's negligence. For Mrs. Evans' mental condition prevented her from testifying, and Mrs. Clemons said little more than: "Well, as we were pretty well around the curve, this car coming down from the north, I didn't see it until it started to slide towards us, it just whipped

across in front of us and then whipped back again and it damaged our car. * * * It happened fast and I didn't, I wasn't paying any particular attention to the traffic until I see it, this coming towards us." As for defendant's driver, plaintiff's brief tells us, and defendant does not deny, that he "was present in the courtroom during a substantial part of this three-day trial but gave no testimony."

Analysis of the New York law [2] must begin with the much-cited case of Galbraith v. Busch, 267 N.Y. 230, 196 N.E. 36 (1935). The plaintiff there was a guest in an automobile which on a clear day "suddenly swerved from highway and crashed into tree." The defendants were her daughter, who owned the car, and Busch, who drove it. Neither testified. The trial judge thought that the mere fact the car left the highway and hit the tree constituted *prima facie* evidence of negligence, and imposed on the defendants the duty "to go forward with their evidence and show why the car left the highway, why it rammed the tree, and that it did so without any fault or negligence upon the part of Busch"; he thus submitted the case to the jury, which found for the plaintiff. The Court of Appeals, in an opinion by Judge Lehman, over a strong dissent by Chief Judge Crane, held this to be error. The crucial part of the opinion is the two concluding paragraphs, where the Court stated that the circumstances of the accident, "unexplained, justify an inference that the automobile was not carefully operated or was not carefully maintained," and continued: "If the defendants owed a duty to the plaintiff to exercise reasonable care both in the operation and maintenance or repair of the automobile, then the burden of explaining the cause of the accident and showing that it occurred without neglect of duty may, perhaps, logically and properly be shifted to the defendants." But the plaintiff was "only a guest in the car," and thus "assumed the risk of any defect in the automobile which was not known to the defendants," who "assumed the duty to exercise reasonable care for her protection in the operation of the automobile" but "were under no duty to exercise care to discover and repair defects not known to them." Then, decisively: "The evidence, though unexplained, cannot possibly lead to an inference that the accident was due to lack of care in the operation of the automobile, for the probability that it occurred from a break in its mechanism is at least equally great. All that the evidence shows is that the accident may have occurred from any one of many

2. We shall assume, along with the parties, but without deciding, that New York law as to sufficiency of the evidence is controlling in these federal court diversity actions—an issue which the Supreme Court declined to determine in Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), and see the recent denial of certiorari, two Justices dissenting, 371 U.S. 935, 83 S.Ct. 307, 9 L.Ed.2d 271 (1962), to review Merritt-Chapman & Scott Corp. v. Gunderson Bros. Eng. Corp., 305 F.2d 659 (9 Cir.). The present case well illustrates the conflicting pulls on the issue: The state law can be regarded on the one hand as a rule relating to the distribution of power between court and jury and thus as not binding on a federal court under the Seventh Amendment even in a diversity case, cf. Byrd v. Blue Ridge Rural Elec. Co-op., 356 U.S. 525, 537–539, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and Simler v. Conner, 83 S.Ct. 609 (1963), as it surely would not be in a federal question case, see Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2 Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L. Ed.2d 85 (1962), or, on the other, as a substantive rule, which a statute or judicial decision saying "no owner or operator of a motor vehicle shall be liable for an accident in this state solely because the vehicle has skidded" clearly would be. In a way the question leads back to the famous debate between Holmes and Thayer, see Holmes, The Common Law (1881), at 126–29, and Collected Legal Papers (1921), at 232–38; Thayer, A Preliminary Treatise on Evidence at the Common Law (1898), at 228, as to whether determinations of reasonable care are decisions of "fact" or decisions that certain states of fact will or will not warrant submission to a jury and hence rules of "law."

causes, including, perhaps, negligence in operation." And plaintiff "cannot place upon the defendants the burden of exculpating themselves from the charge of neglect of duty until evidence showing *prima facie* that there is such negligence has been presented."

It is immediately apparent that the instant case differs from Galbraith in two important respects; the first is helpful to the plaintiffs, the bearing of the second is more doubtful. Since Mrs. Evans was not a guest of defendant, there was no limitation of the latter's duty of care to her; so that insofar as the Galbraith decision rested on "the probability that [the accident] occurred from a break in its mechanism," which the defendants owed Mrs. Galbraith no duty to discover, that basis is absent here. The second difference is that in Galbraith "there were no extraordinary conditions in the road which would account for the accident," 267 N.Y. at 235, 196 N.E. at 38; here there were. It can be argued that the presence of such conditions works against a plaintiff, since it introduces another element that might cause the accident apart from negligent operation or maintenance; there is some textual evidence in the Galbraith opinion that Judge Lehman would have felt that way. What should be decisive, however, is not the number of possible explanations but their relative probability and, in turn, the legal inferences that can most reasonably be drawn from the most probable ones. When a skid has taken place on a wet or icy road, such possible causes as a defect in the steering mechanism, a blowout (not induced by the skid itself), or a sudden seizure of the driver are enormously shrunk in their probability; indeed, the mind almost leaps to the conclusion that the skid was due to the slippery condition. This leaves unresolved, however, the ultimate question whether due care in the operation of the vehicle would have prevented the skid. Since unusually hazardous conditions require added care, see, e. g., N. Y. Vehicle and Traffic Law, McKinney's Consol.Laws, c. 71, § 1180(1), we would think that proof

of a skid on a highway known to be dangerous took a plaintiff far enough down the probability road to call on the defendant for explanation and, in the absence of a satisfactory one, to go to the jury, and that Galbraith v. Busch is not to the contrary, at least in non-guest cases. The important question, however, is not what we think but what the New York Court of Appeals would think, and we now turn to later New York decisions for such light as they throw.

The first is Lahr v. Tirrill, 274 N.Y. 112, 8 N.E.2d 298 (1937), another guest case, in which Judge Rippey, for a unanimous Court composed of the same judges who had decided Galbraith, again set aside a plaintiff's verdict. The skid occurred on an upstate road under winter weather conditions similar to those prevailing here. The case differs sharply from the present one, however, in the plaintiffs' evidentiary opportunities. Mrs. Lahr, who occupied the front seat next to the driver and was apparently an experienced driver herself, had observed all the operations preceding the accident. She testified to them in great detail, and even said "that defendant, on the occasion of the accident and under the conditions then obtaining, operated the car as she would have done under similar circumstances." Reviewing her testimony, the Court found no basis for an inference of negligence in the method of operation; any such inference would thus have to be based on a defect in the car (such as, we suppose, a worn tread) of the sort for which a defendant would be liable even to a guest. But the plaintiffs had failed to question one witness about such defects and to call another witness who had inspected the car after the accident. With the *most* likely liability-producing cause, negligent operation, thus excluded by the detailed evidence of careful operation, and with the plaintiffs having failed to produce evidence of any other liability-producing cause although they had an opportunity to do so, the Court concluded, citing Galbraith, that "there was no proof of negligence."

344

The next Court of Appeals decision, Cole v. Swagler, 308 N.Y. 325, 125 N.E. 2d 592 (1955), does not add much to Galbraith. It, too, was a guest case in which the car had left a dry pavement; it differed only in that neither the guest nor the driver could testify, both having been killed in the accident. The Court cited and followed Galbraith. In contrast, the Lo Piccolo case, supra, presented the instant syndrome of a non-guest plaintiff, "extraordinary conditions" known to the defendant (a slippery road surface on the Manhattan Bridge), and scant evidence as to the operation of defendant's vehicle (the driver was not called) apart from the fact that it had swerved out of the far-left lane of the three-lane roadway and hit plaintiff's vehicle head-on in the far-right lane. Unfortunately,. the course taken by the proceeding prevented our receiving from it the elucidation of New York law that would presently prove so helpful.

The trial judge sent the case to the jury, which, however, returned a defendant's verdict; the appeal was by the defendant from an order setting aside the verdict and granting a new trial. Justice Breitel, for himself and Justice Rabin, thought both that the Galbraith rule made it improper to send the case to the jury and that, "even assuming that plaintiff had established a *prima facie* case based on *res ipsa loquitur*, it would not have provided such proof of defendant's negligence which a jury, in the absence of rebuttal, was bound to accept." Justice Bergan, for himself and Justice McNally, thought the Galbraith rule had not been and ought not to be applied save in guest cases, and then "move[d] without difficulty to the further view that the verdict for the defendant was against the weight of the credible evidence and that the determination of the judge at Trial Term to set it aside

was justified." Presiding Justice Botein agreed with "Justice Bergan's illuminating analysis of the Galbraith case * * * and with his circumscribed application of that decision," but voted for reversal on Justice Breitel's second ground, namely, "It was for the jury, and not for us, to assess the weight of the inference coupled with the failure of defendant to come forward with its explanation of the manner in which the accident had occurred." Thus, despite the majority vote to reverse, the resultant thrust of the Lo Piccolo opinions in the Appellate Division is favorable to the plaintiffs here, for the vote was three-to-two for limiting the Galbraith rule to guest cases. Accord, Neumann v. Metropolitan Tobacco Co., 20 Misc.2d 1013, 189 N.Y.S.2d 600 (Sup.Ct. Nassau County, 1959) (alternative holding). Affirmance of the Appellate Division by the Court of Appeals, however, was on a still narrower basis: "The jury's verdict in favor of defendant, absent a motion by plaintiff for a directed verdict, is upon this record conclusive against him; consequently, we need not here decide whether plaintiff had made out a prima facie case." 9 N.Y.2d 662, 212 N.Y.S.2d 75, 173 N.E. 2d 51 (1961).

■■ In the light of all the foregoing, we are not persuaded that the law of New York forbids submission of the issue of negligence to a jury on proof of "skidding and nothing more" when the skid occurred under "extraordinary conditions" known to the defendant and the plaintiff was not a guest in the defendant's car.[3] We believe, rather, that under such circumstances the plaintiff would be deemed to have done enough to shift to the defendant the burden of proffering such evidence as is reasonably available to him; if, as here, the defendant fails to do this, the plaintiff then goes to the jury not simply on his own evi-

3. In guest cases, retention of the Galbraith-Lahr rule may be thought to be justified, not only by the lower standard of care in respect to mechanical defects which was relied on in Galbraith, but also by the consideration that a guest usually has better opportunities to observe and consequently to testify as to the operation of the skidding car, and to obtain evidence of its condition after the accident, than does a stranger who was riding in another vehicle.

dence of the skid but with the added help of the inference from the defendant's failure to produce available evidence, 2 Wigmore, Evidence (3d ed. 1940), §§ 285, 290(5), and the combination meets his burden of persuasion. At least this appears to us the right view, see Jaffe, Res Ipsa Loquitur Vindicated, 1 Buffalo L.Rev. 6–7 (1951), and we see nothing in New York jurisprudence to indicate that the Court of Appeals will not adopt it when the issue is squarely presented.

Alternatively, even if the Court of Appeals should ultimately commit itself to a general rule that "skidding alone is not enough," here there was something more. True, the case cannot be brought within such decisions as McMahon v. Staten Island Coach Co., 274 N.Y. 621, 10 N.E.2d 580 (1937); Montgomery v. Humphrey, 284 App.Div. 365, 132 N.Y.S.2d 448 (3d Dept. 1954), and Greyhound Corp. v. Salvation Army, supra, 252 F.2d 331, which found the requisite "something more" in the fact that the defendant's vehicle was on the wrong side of the road before it entered the skid—a doctrine we accept on the law but do not find met on the facts here, since Mr. and Mrs. Clemons testified that defendant's truck was skidding from the moment they first saw it. Neither can we see any logical basis for the suggestion of the Lo Piccolo dissenters that being on the wrong side makes the crucial difference even when that predicament is solely attributable to the skid itself. 7 A.D.2d at 378, 183 N.Y.S.2d at 310. The scant evidence here does afford, however, enough support for an inference that defendant's truck was being driven at a speed excessive under the circumstances. The conditions prevailing at the place and time of the accident—a slushy two-lane road curving downhill, at dusk—made it quite imprudent to drive a truck (which, so far as appears, was not equipped with chains) at any but an unusually slow speed. See N. Y. Vehicle and Traffic Law, § 1180(1). From the distance through which the defendant's truck skidded, the jury could infer that it was exceeding such a speed. Mr. Clemons testified that the Groves truck skidded some distance before reaching the point of collision: "He was coming sideways towards us before we got near enough to pass." And after the collision the Groves truck continued to a point "four or five lengths of the truck" past the Clemons vehicle before it could be brought to a stop—none of which distance was attributable to forward progress by the Clemons vehicle, since it "stopped right where the accident happened." This suffices to bring the case within such New York decisions, finding the requisite "something more" in evidence of excessive speed, as DiSalvo v. City of New York, 254 App.Div. 886, 5 N.Y.S.2d 264 (2d Dept. 1938); Sweet v. Farmers Syndicate, Inc., 279 App.Div. 1118, 112 N.Y.S.2d 580 (3d Dept. 1952);[4]

4. The Sweet decision rested in part on § 56(1) of the Vehicle and Traffic Law, enacted in 1946 and repealed in 1960, which provided that "no person shall operate a motor vehicle * * * upon a public highway at such a speed as to endanger the life, limb or property of any person, nor at a rate of speed greater than will permit such person to bring the vehicle to a stop without injury to another or his property." In People v. Firth, 3 N.Y.2d 472, 168 N.Y.S.2d 949, 146 N.E.2d 682 (1957), the Court of Appeals held this statute "too vague and indefinite to constitute a sufficient definition of criminal conduct." Although the Court did not have the statute's applicability to civil cases before it, Judge Desmond said the statute "contains no sufficient standard by which a driver's conduct may be tested. One could go further and say that the statutory verbiage is practically meaningless." In Armondi v. Johnson, 16 A.D.2d 712, 226 N.Y.S.2d 714 (3d Dept.1962), and Sandola v. Pearlman, 16 A.D.2d 965, 230 N.Y.S.2d 59 (2d Dept.1962), it was held reversible error to charge a jury in the language of the statute in a civil case arising from an accident which took place after the Firth decision. While the accident in the present case antedated Firth, we should doubt, in the light of Judge Desmond's analysis, that the Court of Appeals would regard the statute as validly enacting

Reich v. Evans, 7 A.D.2d 765, 180 N.Y.S. 2d 159 (3d Dept. 1958) ; and Neumann v. Metropolitan Tobacco Co., supra, 20 Misc. 2d 1013, 189 N.Y.S.2d at 604–605 (alternative ground). Cole v. Swagler, supra, 308 N.Y. 325, 125 N.E.2d 592, differs in that there was nothing to suggest that the car was exceeding the 50 m.p.h. speed limit, and such a speed was not unreasonable under the dry weather conditions there prevailing.

### III. REFUSAL TO GIVE THE REQUESTED CHARGE AS TO NEGLIGENCE.

■ The judge charged that plaintiffs must prove "by a fair preponderance of the evidence" that the injury "was caused through the negligence of the defendant Groves Company, or the driver of its automobile, at the time and place we have already mentioned"; that negligence is "carelessness," "a failure to do * * * that which a reasonably prudent person would do under like circumstances"; and that "negligence in the operation of a vehicle under adverse conditions, snow, ice and whatnot" on a country road may be "something else" than negligent operation on a dry highway or a city street. Defendant's counsel made no objection to the charge, but then asked the judge "to charge this jury the sloughing of the rear end of Mr. Mulcay's [the driver's] truck in and of itself is not negligence." The Court refused the request, saying "I will leave that to the jury itself. Consider all the circumstances. They may take into consideration all of the circumstances that existed there in considering that question." All this took place in the presence of the jury, counsel having declined the judge's offer to permit the request to be made outside the jury's presence.

The case illustrates the wisdom of the provision in F.R.Civ.Proc. 51 that "At the close of the evidence or at such earlier time during the trial as the court reason-

ably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests." Here the judge, having properly charged the jury, was asked to rule, off the cuff and in the jury's presence, on a belated oral request for an additional instruction which posed, as we have seen, a difficult issue of New York law. His refusal to honor such a request would not require us to reverse even if a refusal to give the same charge on a timely written request would. Turner Construction Co. v. Houlihan, 240 F.2d 435, 439–440 (1 Cir., 1957) ; see Metropolitan Life Ins. Co. v. Talbot, 205 F.2d 529, 533 (5 Cir., 1953) ; Seeraty v. Philadelphia Coca-Cola Bottling Co., 198 F.2d 264, 265 (3 Cir., 1952). We are thus not required to consider whether the latter condition is met, although the writer would affirm on the further ground that at the very least the requested instruction required qualification in important respects, and that failure to give a properly instructed jury even a seasonably requested additional charge is not reversible error unless such charge, in addition to being material and not repetitious, is correct and complete. Martin v. United Fruit Co., 272 F.2d 347, 349 (2 Cir., 1959) ; Pettus v. Grace Line, Inc., 305 F.2d 151, 154 (2 Cir., 1962).

### IV. THE JUDGE'S ANSWER TO THE JURY'S REQUEST FOR A FURTHER INSTRUCTION ON CAUSATION.

■ In contrast to the sparse testimony as to the reason for the accident, the record contained much evidence as to the cause of the heightened intracranial pressure which produced various symptoms of mental deterioration, required long hospitalization and surgery, and eventually led to Mrs. Evans' incompetence. As stated above, plaintiffs' case was that this pressure was due to a thrombosis of the left lateral sinus resulting from the collision, and there was

---

a standard of conduct for any purpose. Hence we have given no weight to it here. Section 56(1) was superseded in 1960 by Vehicle and Traffic Law § 1180(1), re-

quiring a speed "reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing."

adequate evidence to sustain both elements of this claim. Defendant's prime theory was that Mrs. Evans was suffering from a brain tumor, which had already produced head symptoms prior to the accident and was in no way affected by the impact. Alternatively, defendant submitted some evidence that if thrombosis of the sinus were the correct diagnosis, this condition was due not to the collision but to a disease in the middle ear, which allegedly was evidenced by the hearing difficulties Mrs. Evans had reported to Dr. Redmond before the accident. The judge charged, *inter alia,* that the plaintiff must show that the accident was the "proximate cause" of Mrs. Evans' condition and, quoting from a text, that this means "the moving or efficient cause without which the accident or the injuries in this case would not have occurred."

The jury, having received the case at about 5:30 p. m. and taken time out for dinner, deliberated further and then sent the judge the following message:

"In your charge to the jury did you state we must decide if the accident and/or injury must be the direct cause of the plaintiff's condition? Or is it our prerogative to consider the injury aggravated a pre-existing condition thereby establishing a causal relationship and on that premise to find damages for the plaintiff."

Considering the jury to have asked two questions, the judge, shortly after midnight, responded to what he termed the first by repeating that the accident "must be a moving or efficient cause without which the injuries would not have occurred." In answer to the "second question," he said, *inter alia,* that "a defendant is chargeable for all the harm and suffering which his negligent act brought on even though plaintiff's injuries were aggravated by his own predisposition or weakness," and that "a defendant must take a human being as he finds him, and if a human being has a predisposition to an illness and is injured, why of course that does not excuse the defendant for the damages which he himself has caused. It does not of course authorize the awarding of damages for the condition that existed prior to the accident * * *." After the jury retired, defendant's counsel objected that the first question should have been answered yes, and, more importantly, that since "no aggravation of a pre-existing condition" had been pleaded or proved, the jury should have been told in answer to the second question that it "may not consider damages for an aggravation of a pre-existing condition." Shortly after 1 a. m. the jury brought in its verdicts.

Lawyers and judges understand "aggravation" to refer to cases where a plaintiff already incapacitated in some degree by a disease or injury suffers a worsened condition as a result of the defendant's wrongful act; in such cases the defendant is liable for the additional harm that he caused. See 2 Harper & James, Torts (1956), at 1128 & cases cited n. 25. McCahill v. New York Transp. Co., 201 N.Y. 221, 94 N.E. 616, 48 L.R.A.,N.S., 131 (1911), one of the two New York decisions from which the judge stated that he drew his answer to the jury's second question, illustrates a related but slightly different problem— that of a plaintiff with a special physical condition perhaps in no way permanently disabling, such as pregnancy, which makes the consequences of the negligently inflicted impact much more serious than they would be for the normal victim.[5] In such cases the defendant is li-

---

5. Thus, in the McCahill case an accidental injury to the thigh and knee precipitated an attack of delirium tremens that caused death. See also 2 Harper & James, supra, at 1127 ns. 22, 23; Prosser, Torts (2d ed. 1955), at 260 ns. 65–67. The other New York case that the judge quoted, Poplar v. Bourjois, Inc., 298 N.Y. 62, 80 N.E.2d 334 (1948), was even less apposite; the remarks which he used were made there as dicta in the course of discussing a manufacturer's possible

able for the entire damage, American Law Institute, Restatement of Torts, § 461, unless he succeeds in establishing that the plaintiff's pre-existing condition was bound to worsen, in which event an appropriate discount should be made for the damages that would have been suffered even in the absence of the defendant's negligence. American Law Institute, Restatement of the Law Second, Torts, Tentative Draft No. 7 (1962), § 433B. Still different is the case of concurrent causes, "where defendant's negligence and another cause for which defendant is not responsible would each have caused the *whole* injury even in the absence of the other cause." 2 Harper & James, supra, at 1122. Although there is division in both judicial and academic authority, the tendency favors imposing liability in such a case if the defendant's act is a substantial causative factor, 2 Harper & James, supra, at 1122–23; Prosser, supra, at 220–21; American Law Institute, Restatement of Torts, § 432(2); cf. Dunham v. Village of Canisteo, 303 N.Y. 498, 104 N.E.2d 872 (1952). The proportion of the total damages for which the defendant is liable in such cases seems not to be much discussed, apparently on the theory—generally but perhaps not always true—that apportionment would be either logically or practically impossible.

Although the judge's midnight remarks, as applied to the facts, rather agglomerated these different situations and the legal principles governing them, the question before us is not whether he would have earned an "A" on a law school examination but whether, in the context of the case at hand, his answer was so misleading as to work the material prejudice to the defendant nec-

essary to warrant our directing a new trial. 28 U.S.C. § 2111. We think not.

The jury, quite obviously, was troubled by the evidence that Mrs. Evans had experienced dizziness and other symptoms suggesting a cranial difficulty before the accident. It thus asked whether the accident "must be the direct cause of the plaintiff's condition." The judge's reply to this branch of the inquiry was, if anything, too favorable to defendant, for in requiring that the accident be found to be a cause "without which the injuries would not have occurred," he excluded the possibility of a plaintiffs' verdict based on the theory, sustainable under the law if the evidence warranted, that the accident and the pre-existing ailment were "concurrent causes" of the ultimate injury. If the judge had added only that in fixing damages the jury should take account of the fact that Mrs. Evans was not enjoying perfect health before the accident, and should further reduce its award if it found that her pre-existing ailment would have worsened and independently brought about some of the difficulties that she in fact experienced after the accident, or all of these difficulties but at a later date, defendant could have had no ground for objection. The contention is, however, that in responding to the second branch of the inquiry the judge went beyond this and erroneously gave an affirmative answer to the jury's question whether it could "consider the injury aggravated a pre-existing condition thereby establishing a causal relationship." Insofar as the asserted vice in such an answer is that it authorized the jury to find for the plaintiffs on the basis that the accident "aggravated" a pre-existing *tumor*—a theory which there was no evidence to support—we

liability for an "unforeseeable" infection and amputation resulting from a consumer's contact with a sharp metal point on its product.

The difficulties created here by the *verbatim* use of these New York decisions in answering the jury's inquiry emphasize the inadvisability of a trial judge's quoting from opinions rather than

addressing himself to the facts of the case before him. As has often been pointed out, see, e. g., United States v. Lefkowitz, 284 F.2d 310, 313–314 (2 Cir., 1960), statements in the opinion of an appellate court that are entirely correct as to the case *sub judice* may prove unilluminating, or even misleading, as applied to a different fact situation.

think the judge's clear and strict answer to the first part of the question, as applied to the evidence, makes it quite inconceivable that the jury could have rendered its verdict on such a view. There is more likelihood, however, that the jury understood the second answer to authorize a plaintiffs' verdict if, accepting thrombosis of the sinus as the proper diagnosis, it found that while this condition would not have occurred "but for" the accident, the condition would also not have occurred "but for" a pre-existing ear disease, so that the defendant's conduct was a contributing cause of the harm but would not alone have sufficed to bring it about.

This is certainly not bad law; it merely assimilates the present case to that of the "special physical condition" which makes the consequences of the impact more serious for the particular victim than they would be for others, a situation which, as we have seen, warrants the imposition of full liability in the absence of proof that the condition would have developed in any event. Appellant contends, however, that such a result is bad medicine; such a theory of liability must be excluded, it asserts, because, while "there was evidence of a pre-existing condition * * *, [there was] no evidence at all that this accident could aggravate or trigger this condition so as to produce the intracranial pressure." But there was medical evidence that thrombosis, or blockage, of the sinus could be caused by ear disease or by head injury; that both causes were common ones; and that the condition could develop "when circulation is at a low ebb from any cause." We think the jury could infer from this evidence, at least in the absence of proof that such

an occurrence was medically impossible, that in a given case the two causes had cooperated to bring about the result—that the pre-existing ear disease had, for example, produced a partial blockage or lowered the circulation before the accident and thus created a weakened condition which contributed, along with the head injury, to causing the thrombosis. It is true that no medical expert testified specifically as to the possibility of such cooperative causation; but the inference is a rational one from evidence in the record, and we see no reason why the expert medical nature of that evidence should restrict the jury's customary power to draw rational inferences. So long as the decision of complex medical issues is left to laymen, it must be expected that juries will occasionally provide news for doctors. We would view this with some equanimity if all juries were as diligent and objective in analyzing the factual issues before them as, judging by the searching nature of its question and the extent of its deliberation, this one was.

Affirmed.

SWAN, Circuit Judge (concurring).

Since the plaintiffs clearly understood the effect of their release I should, if sitting alone, have held that "the agreement was fairly and knowingly made," and that they should have been bound by its terms, although later events proved them unwise to have signed it. Judge Friendly's treatment of the Farrington dictum and the Yehle decision is not thoroughly persuasive to me. However, as the New York cases "do not yield an assured conclusion" and my arguments have not convinced my brothers, I reluctantly concur.