**Kenneth C. KEGEL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 2709.**

United States District Court
D. Montana,
Havre-Glasgow Division.

Sept. 19, 1968.

Habedank, Cumming & Best, Sidney, Mont., for plaintiff.

Moody Brickett, U. S. Atty., Butte, Mont., and Clifford E. Schleusner, Asst. U. S. Atty., Billings, Mont., for defendant.

## ORDER AND MEMORANDUM OPINION

JAMESON, District Judge.

Plaintiff brought this action under the Federal Tort Claims Act for injuries sustained in an accident about 1 p. m. on December 7, 1966, when a 1966 Plymouth sedan, driven by Timothy A. Armstrong, an agent and employee of the United States Government, struck plaintiff's two-ton truck on U. S. Highway #2 where the highway enters Chinook, Montana. The case was tried before the court without a jury on April 3, 1968. Post trial briefs were filed, the last brief on July 29, 1968.

At the point of collision the road was icy, the weather was cold and clear, and visibility was unobstructed. Plaintiff was driving his truck in an easterly direction at a speed between 6 and 15 miles an hour. The Armstrong vehicle was traveling in the same direction some distance back of plaintiff's truck. Armstrong first observed the truck when he was between 300 and 450 feet away. When Armstrong saw a restricted speed sign and plaintiff's truck and also observed the icy condition of the highway, he slowed to 45 miles an hour. He skidded and was unable to stop on the icy highway or to turn from his course of travel, although he tried to turn both to the right and to the left. His car collided with the rear of plaintiff's truck.

While Armstrong testified that the road had been clear of ice until he reached the outskirts of Chinook, Kegel testified that there had been intermittent icy stretches at various points between Havre (some 20 miles distant) and

Chinook. Kegel's testimony is the more probable, particularly in view of the admittedly severe icy condition on the approach to Chinook.

Both vehicles were driven off the highway. Plaintiff got out of his truck first and Armstrong was still in his car when plaintiff asked him if he were hurt. Armstrong's mouth was bleeding, but neither party appeared at that time to have been hurt.[1] Plaintiff walked to a grain elevator and called for a policeman. When the policeman arrived, plaintiff moved a 138 pound spare tire onto the truck.

■ Armstrong was traveling at an excessive rate of speed in view of the icy condition of the highway and did not have his vehicle under proper control. I have no difficulty in finding that Armstrong was negligent and that his negligence was the proximate cause of the collision.

While the issue of liability is easy to determine, the issues relating to the cause of plaintiff's subsequent disability and possible apportionment of damages are exceedingly complex and require a careful analysis of the evidence relating to plaintiff's symptoms, the medical testimony and the applicable rules of law.

Plaintiff seeks $150,000 general damages and $2214.94 special damages consisting of damage to his truck in the sum of $211.83, medical and hospital expenses $1823.63 and miscellaneous expenses $179.48. Plaintiff is a rancher near Turner, Montana. He has calculated general damages by three methods: "cost of hiring a replacement" method, "loss on the cattle feeding operation", and "increased expense of operation". The average of these three amounts is $127,799.00.[2] Plaintiff also asks $11,650 as compensation for his pain and suffering during 1967 and $18,984.05 for future pain and suffering.

Kegel testified that the evening after the accident he had a severe headache and a lump on his head and that he was sore in the shoulder area. Around the 17th or 18th of December, he began having back trouble. While he continued with his farm work, the condition became progressively worse. On January 25, 1967, he consulted Dr. Albert W. Axley of Havre. X-rays taken at that time showed a narrowing or degenerative disc at the L–5 area of plaintiff's back. Dr. Axley recommended that plaintiff see an orthopedic surgeon in Great Falls and warned plaintiff that. if the back pain became worse or if plaintiff developed any paralysis or weakness in the leg, he should consider surgery.

The back pain became more severe. On January 31 plaintiff consulted Dr. J. L. Bloemendaal, an orthopedist in Great Falls, who diagnosed a herniated disc. A fusion was performed between the L–5 and S–1 vertebrae to eliminate motion and pain. Plaintiff was discharged from the hospital on February 17, 1967.

Plaintiff testified that he had no specific back trouble prior to December 17th or 18th, 1966. His wife testified that plaintiff had complained of "backaches now and then" but that he was never disabled from the pain. He had never consulted any physician, osteopath or chiropractor for any back condition prior to his visit to Dr. Axley on January 25, 1967. About a week or two before that, Mrs. Kegel became concerned and urged a checkup.

On August 29, 1967, Dr. Bloemendaal examined plaintiff and found that an area of tenderness was present at the top of the incision. Cortisone was injected to relieve the pain. On February 7, 1968, Dr. Bloemendaal again examined the plaintiff and found that he was "still having some discomfort," that there was an area that was questionable as to whether the fusion had solidified, but

---

1. While plaintiff now claims to have been momentarily unconscious, the evidence as a whole does not support this claim.

2. In computing damages, plaintiff assumes that in the absence of the accident, he would have been able to do his regular farm work for a period of twenty years.

that surgery was not yet recommended. The doctor believed that plaintiff's condition would improve.

When plaintiff consulted Dr. Axley for a life insurance physical on November 1, 1967, the doctor noted that "he was apparently getting along adequately as far as I can understand he had a good result from this operative procedure."

Doctor Thomas C. Powers, an orthopedic surgeon of Great Falls, examined plaintiff on February 7, 1968, on behalf of the defendant. Dr. Powers testified that he believed the fusion after the operation was solid.

It will be noted that both Dr. Bloemendaal and Dr. Powers last examined Mr. Kegel approximately a year after the surgery and two months before the trial. Both anticipated further improvement— Dr. Powers over a period of at least six months and Dr. Bloemendaal "probably over the next year or two".

Both Dr. Bloemendaal and Dr. Powers are well qualified orthopedic surgeons. In analyzing their testimony it is important to distinguish between what is "possible" and what is "reasonably probable".

The doctors agree that it takes very little to herniate a disc. It may result from sneezing, twisting around, stepping off the edge of a curb, (Dr. Bloemendaal, Tr. pp. 38–39) or bending down to put on shoes and stockings (Dr. Powers, Tr. p. 13) and this could have happened in Mr. Kegel's case.[3] The doctors agree also that the degeneration of the disc had probably been "going on for several years".[4]

Dr. Bloemendaal testified that some discs fuse on their own but this happens only occasionally. "Just playing the percentages I doubt Mr. Kegel would have fused on his own" (Tr. p. 35).

In response to leading questions both doctors recognized also that "many people will show degeneration of discs and have no symptoms or back trouble (Bloemendaal, p. 10, Powers p. 24). Their answers were not related specifically, however, to what might have been reasonably anticipated in Mr. Kegel's case in the absence of the accident.

In answer to a hypothetical question, Dr. Bloemendaal testified that in view of the fact that Kegel "had had no real major problem with his back prior to this, I would feel that an accident such as this triggered this degenerative disc, probably to cause the back and leg pain". (Tr. p. 32). Dr. Axley, also in answer to a hypothetical question, agreed that there

3. On cross-examination Dr. Bloemendaal testified in pertinent part:

"* * * it takes very little to herniate a disc. To give you an example, in the last six weeks I have seen two patients with degenerative disc disease who have sneezed and herniated a disc. If a person has a pre-existing degenerative process going on they can turn around like this (indicating) and herniate a disc. It takes very little. This blow alone is enough for me. Whether he stepped off the edge of a curb or stepped up to it, after that he could have done a dozen things that still could have herniated the disc.

"Q So that anything Mr. Kegel could have done. Was his condition such that any of these things you have described could have herniated that disc?

"A That is correct.

"Q And this could be done by him doing ordinary farm work, is that right?

"A Yes.

"Q It could be done by him lifting calves, or lifting a bale of hay?

"A That is right.

"Q It could be done even by lifting the tire?

"A That is right.

"Q Actually, Doctor, you really can't tell with reasonable medical certainty actually what might have herniated this disc, can you?

"A No, except generally by the history of what we have gone through, that is right. You can't 100 per cent say this did it or this did it, that is correct." Tr. pp. 38–39.

4. According to Dr. Powers, "a person who has chronic disc degeneration between L 5 and S 1, the significance of it is he has lumbo sacral arthritis * * * for chronic disc degeneration to occur and for these arthritic signs to be noted, that months and months, maybe even into years have to take place before this would be manifest on x ray."

"was some causal relationship unless there is some proof that something else intervened or something else added to the picture". (Dep. p. 17).[5]

On the other hand, Dr. Powers did not believe the "accident was the precipitating factor because (plaintiff's) acute symptoms started on January 24". He would have expected the back pain "immediately" or "at least within a couple of days". Dr. Powers distinguished between a "precipitating" factor and an "aggravating" factor, testifying in part:

"A * * * I think, however, that an injury of this nature can be an aggravating factor in the same way that his normal way of life in bending and twisting and lifting can be. It could be without this accident, instead of having acute disabling symptoms in the latter part of January, maybe they wouldn't have occurred until May or September or been a year or two later. In other words, I think this accident was another injury in his way of life, which the summation of which was ultimately to bring this to clinical manifestations where he was having acute symptoms. In other words, for a person with this type of finding in their back, they do not have to be in an automobile accident or have some severe injury, because the mere fact of bending and twisting in their normal way of life can be aggravating enough."

Dr. Powers estimated a 10% impairment following a successful fusion such as he found with Mr. Kegel. He would anticipate that his back would be better than it was prior to the accident.[6]

On the basis of the medical testimony, defendant contends that plaintiff has failed to sustain his burden of proving that the accident caused the herniation of the disc and that the testimony as a whole does not show more than a remote possibility that the accident was a cause of the herniation. On the other hand, plaintiff argues that under the medical testimony and particularly the opinions of Doctors Bloemendaal and Axley, plaintiff has shown that the accident was the precipitating cause of the herniation; that it is medically impossible to separate or segregate that portion of plaintiff's injuries which were attributable to the pre-existing condition from those attributable to the trauma in the accident; and that accordingly defendant is liable for any resulting disability notwithstanding the pre-existing condition and the fact that other causes may have contributed thereto. Plausible arguments with the citation of numerous cases are presented in support of both positions. Again we must distinguish between what is possible and what is reasonably probable.

■ It is true, of course, that plaintiff has the burden of showing that the "conduct of the defendant has been a substantial factor in bringing about the harm he has suffered" and that "a mere possibility of such causation is not enough". On the other hand he is not required to "prove his case beyond a reasonable doubt and eliminate entirely all possibility that the defendant's accident was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the injury was caused by

5. In a brief history taken on January 25, 1967, Dr. Axley did not learn of the accident of December 7, 1966, and in fact knew nothing about it until interviewed by counsel in advance of trial. Nor was the accident mentioned in the history taken by Dr. Bloemendaal on January 31, 1967.

6. Dr. Powers testified in part:
"Q I want to clarify the question I previously put. Did I understand you to say that this patient's back, Mr. Kegel's back will be better than it was prior to the accident, with the condition he had which you testified pre-dated the accident?"
"A With the successful fusion, for an individual who has chronic disc degeneration with symptoms, I would anticipate his back would be better. As I say, otherwise surgery wouldn't be advised for these people, which it so frequently is." Tr. pp. 17–18.

the defendant than it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise". Restatement (Second) of Torts § 433B, comments a and b (1965).

■ Considering the medical testimony as a whole, I find that the collision was a substantial factor in causing a more rapid progress of plaintiff's herniation.[7] On the other hand, particularly in view of Dr. Powers' testimony quoted supra, I find further that the chances of Mr. Kegel's continuing to do his regular farm work without herniating the disc were exceedingly remote and that it is reasonably probable that within two years or earlier (as Dr. Powers has indicated) the disc would have ruptured in the absence of the accident, resulting in the same disability.[8] The accident may well have *hastened* the disability, but Kegel's condition would have worsened in the absence of the accident, assuming he continued with his regular farm work. It may be said that the accident was an aggravating factor, but not the sole precipitating cause of the herniation of the disc.

In other words, just as the probability that the collision was a substantial factor in causing the herniation is in favor of plaintiff, the probability that surgery would have been required or that plaintiff would have been seriously disabled in the absence of the accident is in favor of the defendant. Neither is susceptible of "mathematical proof".

■ Under Montana law the measure of damages in a tort action is "the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not". R.C.M. 1947, § 17–401. This includes damages for aggravation of a pre-existing condition. On the other hand, plaintiff is not entitled to recover damages which would have resulted from his previous condition without the aggravation.[9]

■ A negligent actor may be liable for harm increased in extent by another's unforeseeable physical condition, where, for example, a slight injury causes a cancerous condition to "light up" and localize, or where a minor injury has serious consequences because of a latent infection. Restatement, supra, § 461.[10]

---

7. Defendant's briefs and evidence have stressed the fact that the plaintiff's moving the 138 pound spare tire into the truck after the collision could just as well have been the cause of plaintiff's herniation. However, assuming that immediately after the accident plaintiff was not aware of any injury to himself—a fact on which both sides seem to agree—then for plaintiff to retrieve the tire, especially at the direction of policeman Gipe, would be a natural consequence of the collision. Defendant would therefore be liable for injuries caused by plaintiff's moving the tire because plaintiff, accustomed to handling heavy weights, would not realize that lifting the tire could be injurious to him. See 38 Am. Jur., Negligence § 84.

8. There is of course no way of knowing just when the disc might have herniated or reached a point when it would have been disabling. It is possible that Kegel would have been disabled without having surgery, but as noted supra, in that event the disablity might well have been greater than it was following the fusion.

9. The general rule is well-stated in 22 Am.Jur.2d 174, Damages § 122 as follows:

"The right of a person suffering from a disease who is injured by reason of the negligence of another, to recover for all damage proximately resulting from the negligent act, includes the right to recover for an aggravation of that existing disease. Of course, where the disease is more than a mere latent tendency, the defendant can be held liable only to the extent that his negligence proximately and naturally aggravated the disease; the recovery includes no damages for injuries which result from the original condition, but is confined to those which are due to its enhancement or aggravation."

10. See also Prosser on Torts, 3rd Ed. 301: "The defendant of course is liable only for the extent to which his conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was; but as to the aggravation, foreseeability is not a factor."

On the other hand, "the injured person may not recover damages for injuries which are not attributable to the wrongful act, but which result from his original condition * * * ". 25 C.J.S. Damages § 21, p. 659. Where a pre-existing condition is "bound to worsen, * * * an appropriate discount should be made for the damages that would have been suffered even in the absence of defendant's negligence." Evans v. S. J. Groves & Sons Co., 2 Cir. 1963, 315 F.2d 335, 348.

This rule was followed in Henderson v. United States, 5 Cir. 1964, 328 F.2d 502, 504, an action involving damages for aggravating a pre-existing back ailment, the court saying in part: "The trier must also determine whether or not the pre-existing condition was bound to worsen, in which event an appropriate discount should be made for the damages that would have been suffered even in the absence of the defendant's negligence."

The general rules with reference to liability for aggravation of a pre-existing disability were restated by the Court of Appeals for the Ninth Circuit in Sweet Milk Co. v. Stanfield, 1965, 353 F.2d 811, 813, the court saying in part:

"We recognize the rule that a tortfeasor is liable to the extent that his wrong aggravates a pre-existing disability, but in such case, he is liable only to the extent of the aggravation. He is not liable for the pre-existing condition as such. It is also true that one may be afflicted with a latent disability which is activated by a tortfeasor's wrong. In such a situation, the wrongdoer may be held responsible for the disability produced by his wrong even though so great a disability would not have been produced in one not previously afflicted. *Here again, the wrongdoer could not be liable for the previously existing, afflicting, latent condition as such, nor for such disability as might have eventually developed from the latent condition even in the absence of external aggravation.*" (Emphasis added.)

On the basis of the medical testimony as a whole, and particularly the opinion expressed by Dr. Powers, I find that plaintiff's condition was bound to worsen in the absence of the accident. To permit plaintiff to recover for loss of income and pain and suffering for his life or work expectancy (or for a period of 20 years) on the assumption that he would be able to continue with his regular work is unrealistic and would be manifestly unfair.

■ Under the court's findings with respect to causation and worsening of plaintiff's condition in the absence of the accident, is there any reasonable or logical basis for apportioning the damages? The general rules with respect to apportionment are well-summarized by Dean Prosser as follows:

"Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has caused, it may be expected that the division will be made. Where no such basis can be found, and any division must be purely arbitrary, there is no practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it."

Recognizing the "obvious difficulties of proof" as to apportionment, Prosser concludes that, "In general, it may be said that entire liability will be imposed *only* when there is no reasonable alternative". Prosser on Torts, 3rd Ed. 248–9.

In the recent case of Larsen v. General Motors Corporation, 8 Cir. 1968, 391 F.2d 495, the court held that a manufacturer may be held liable "for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design". With particular reference to apportionment of damages the court said: "The manufacturer argues that this is difficult to assess. This is no persuasive answer and, even if difficult, there is no reason

to abandon the injured party to his dismal fate as a traffic statistic, when the manufacturer owed, at least, a common law duty of reasonable care in the design and construction of its product. The obstacles of apportionment are not insurmountable. It is done with regularity in those jurisdictions applying comparative negligence statutes and in other factual situations as condemnation cases, * * *".

Dr. Powers' testimony in my opinion affords a basis for a "rough practical apportionment". Under his testimony it is reasonably probable that in the absence of the accident the disc would have herniated within not more than a two year period. While plaintiff seeks $5,901.20 as the annual cost of replacement labor at present wages, the proof did not support a claim for that amount even during the first year following plaintiff's surgery.[11] Plaintiff did some work during a part of that period and his capacity to engage in normal farm-ranch work will increase as his condition improves. Obviously there will be some duties, including heavy lifting, which he should not perform in the future. The same would have been true in the absence of the accident.

Plaintiff is entitled to damages resulting from the hastening of his back condition, including pain and suffering, during the additional period of disability reasonably caused by the accident. As indicated supra, it is impossible to calculate these damages with mathematical certainty, but in my judgment the proof sustained an award of $10,000 for personal injuries and $211.83 for damage to his truck.

It is my conclusion that (1) the driver of the Government vehicle was negligent; (2) his negligence was the proximate cause of the collision with defendant's truck; and (3) plaintiff is entitled to judgment against the defendant for $10,211.83.

This memorandum opinion shall constitute the court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

It is ordered that judgment be entered for the plaintiff and against the defendant in the sum of $10,211.83, together with plaintiff's costs to be fixed by the clerk, and interest at the legal rate from the date of entry of judgment.

---

11. The evidence shows $1,680 unpaid wages due plaintiff's son, Dan Kegel, and other labor amounting to approximately $900.