[No. 37884.    Department One.    January 13, 1966.]

INDUSTRIAL ELECTRIC-SEATTLE, INC., *Respondent*, v. NICK BOSKO *et al., Appellants.**

*Reported in 410 P.2d 10.

*Bianchi & Tobin* (*Phillip Offenbacker,* of counsel), for appellants.

*Short, Cressman & Cable* (*Joan E. Hansen,* of counsel), for respondent.

DONWORTH, J.—This is a suit for damages for breach of an alleged contract between plaintiff subcontractor and defendant general contractor. The trial court held that plaintiff subcontractor had proven the existence of a contract implied in fact and entered a judgment for $6,549 as damages resulting from the breach thereof. The general contractor has appealed.

Prior to any contact between the parties, the general contractor, Nick Bosko,[1] was preparing his bid as a general contractor on Metro Project 62-4, known as the Elliott Bay Interceptor Sewer. He had recently come to Tacoma and was a comparative stranger in the Puget Sound area. He knew few, if any, contractors by reputation or experience in that locality. He hired an engineer who helped him estimate the cost of the entire project, including the sewer line itself (which he intended to build himself) and also the outlying structures, which housed mechanical and electrical equipment. The latter were physically separated from the sewer line and Mr. Bosko expected to subcontract

---

[1]The general contractor was actually a joint venture composed of Nick Bosko, doing business as Bosko Engineering and S. L. Rowland Construction Co., a corporation. However, since all of the dealings between plaintiff and defendant were handled by Nick Bosko as representing the joint venture, he will be referred to as though he were the sole general contractor.

their construction as well as the electrical installation to be housed therein to some other contractor. The bids for the Metro Project were to be opened at 2 p.m. on July 12, 1962, at the Metro office in Seattle.

On July 9, 1962, Nick Bosko telephoned the plaintiff, Industrial Electric-Seattle, Inc., from Tacoma, and talked to Howard Bayley, then vice-president of the corporation. Bosko inquired if plaintiff intended to submit a bid for the electrical work involved in Metro Project 62-4. Bayley had never heard of Bosko before that telephone call, and did not want to commit the company regarding a bid until he had checked Bosko's background. Bayley asked Bosko to telephone again in a day or so.

Bosko telephoned again on July 11, 1962, at which time Bayley told him that Industrial Electric would bid. He advised Bosko that the pricing was not completed, but that the bid would cover sections C8.05, C8.09, C8.11 and C15 of the Metro specifications. Concerning this second conversation, Bayley testified as follows:

A. When I outlined the scope of the quotation, he said, "What about the rest of the work?" I explained this was something outside of our province. . . . Q. What did he mean by the rest of the work? A. The thing he was a little concerned about at the time was a complete job. . . . Q. A complete job? A. Complete electrical job. As we normally bid the work. This is the sort of work we do. He explained he wanted the buildings, too. It was at this point that I discovered he with his own forces had not intended to build the buildings or do any of the work other than pipeline work, and I told him it was far too late for me to do anything, but I would try to get some of my friends who might be bidding, too, to quote a figure to him for the structures themselves. Q. And what type of work did building the structures consist of, Mr. Bayley? A. This particular job involved piling, both concrete and wood, riprap; there was considerable excavation below the water table, and the reinforced concrete structures themselves below and above grade. Q. Is this work you have just described work that your company does by itself? A. No. We have never done this sort of work. Q. In other words, does your company

do any concrete work? A. Not as it pertains to buildings or structures, no.

Mr. Bosko's testimony about this same conversation was:

Q. What did you ask him [Mr. Bayley] for, or what did you say to him on this second conversation? A. Well, we had a lengthy discussion. I thought that was the second time we talked, and I asked him about mechanical and structures, and he says that he knew— . . . Q. . . . Did you discuss with him at that time any quotations or anything other than electrical work? A. Discussed? Yes. Q. And what did you say to him? A. I asked him a bunch of questions about structures and the —and the mechanical, and he says he could help me by —he worked with mechanical people and structural people, he will be able to help me out that way. . . . Q. . . . What was said by Mr. Bayley? A. Well, all I can remember is, what stayed in the back of my mind, that we were talking about the mechanical and the structurals, that he could arrange to do the whole job, and he could—but at that time he can't give me no price on that, that would take a little time, and he made me think that after the bid opening, if I got the job, he can help me out there. Q. Did he give you a price on anything then? A. He didn't give me any price until the next conversation . . . .

The two men agreed that Bayley was to telephone Bosko in Tacoma on the morning of July 12, 1962, prior to 10 a.m., with the pricing, and if Bayley failed to telephone by then, Bosko would telephone Bayley when he arrived at the Washington Athletic Club in Seattle, where he intended to complete his bid for submission to Metro. Bayley failed to telephone by 10 a.m., and Bosko telephoned Bayley about noon on July 12, 1962, and asked him for a pricing. Bayley gave him a price of $53,124 for the electrical work, with an itemization of the brand names and costs for the generator and electrical controls, which items had to be listed separately in the Metro bid. The generator was manufactured by Onan Sons and cost $12,300, and the switch controls were made by Square D at a cost of $8,000. These items were listed in the Bosko bid exactly as given to him over the telephone by Bayley. After receiving

this information, Mr. Bosko stated to Mr. Bayley, "Okay, I will go ahead and bid this job;" "Okay, I will see; I will let you know how we make out."

The name of Industrial Electric-Seattle, Inc. was listed by Bosko in his bid as a proposed subcontractor. There was no other subcontractor listed. The requirements of Metro, stated in its call for bids, were that the name of any proposed subcontractor who was to do work valued at more than one half per cent of the cost of the total project was to be listed by the bidder. The total bid submitted to Metro by Bosko was $2,384,590. Bosko testified that the total bid did not depend on the amount of the electrical bid given by Bayley, and the $53,124 price had no effect on the amount of the bid submitted to Metro by Bosko.

Mr. Bayley testified that, at the time of the third telephone call by Mr. Bosko, there was no discussion of the additional work for the structures or mechanical installations. Mr. Bosko testified that, at the time of this third telephone conversation, nothing was said about the additional work because Mr. Bayley had already agreed to supply him with the additional work figures, and that the only figures Mr. Bosko needed for the purpose of submitting his bid were the figures given by Mr. Bayley on July 12, 1962. Mr. Bosko also stated that he (through his bonding agent) wrote in the name of Industrial Electric because be expected to use it for the electrical work, but that he also expected to use plaintiff to subcontract the "mechanical work" and "structures" because of what Mr. Bayley had said to him on the *second* telephone conversation.

Mr. Bayley heard from a supply company representative who had been present at the time of the bid opening, that Bosko was the apparent low bidder, and that Industrial Electric had been listed by Bosko Engineering as a subcontractor. A day or two later, Mr. Bayley telephoned Mr. Bosko, congratulated him on being the low bidder, and inquired as to when Mr. Bosko thought Metro would award the contract. Mr. Bosko indicated that he did not anticipate any problems as to the award of the prime con-

tract. Nothing was said in that conversation about the electrical bid submitted by Industrial Electric.

Mr. Bosko again explained that he did not intend to use his own force to build the structures or install electrically-powered mechanical equipment which had not been covered by the Industrial Electric figures received on July 12, 1962. Mr. Bayley testified that he had stated that he "would be very glad to be an intermediary between he [Mr. Bosko] and these people who do this sort of work, and we proceeded in that direction preparatory to his being awarded the job." Mr. Bosko testified that Mr. Bayley stated that he would be willing to enter into a subcontract covering the work on the whole construction of the structures and installation of the electrically-powered mechanical equipment.

On July 20, 1962, the general contract was awarded to appellants. There was no written evidence of any contract between appellants and respondent until August 22, 1962, at which time Mr. Bayley delivered a letter to Mr. Bosko in Tacoma, which "confirmed the quotation" of July 12, 1962, and then stated, "As discussed with you, we are pleased to expand the scope of our quotation to the extent noted below." The letter then listed four items of electrically-powered mechanical equipment and included the installation and testing thereof. It also included the construction of five concrete structures and the installation of manhole covers and sluice gates. The additional cost was to be $46,441, which brought the total quoted price to $99,565.

On receipt of this letter, Mr. Bosko indicated to Mr. Bayley that he wished to look it over, especially since there seemed to be some exclusions noted in it. Mr. Bosko testified that he did believe the price was about right for the total work he had wanted done. In later telephone conversations between Mr. Bosko and Mr. Bayley, Mr. Bosko stated that the exclusions were not acceptable.

Mr. Bayley, on September 24, 1962, by telephone, revised his quotation on the structures and electrically-powered mechanical equipment to cover all the items in the Metro specification insisted on by Mr. Bosko, and increased his total bid price to about $130,000, which included the $53,124

which was the amount of the original bid for the four items mentioned in the letter. The balance of the total was for the additional work.

At this point, Mr. Wilder, the engineer for appellants, advised Mr. Bayley that his bid was about $10,000 too high. Mr. Bayley refused to revise his bid further, and stated that the bid was withdrawn.

No confirming letter of the withdrawal of this bid was ever sent, although it was requested by Mr. Wilder. No further negotiations were had by the parties to attempt to reach an agreement.

The ultimate question in the case is—was there an agreement reached by the parties on July 12, 1962, on the four items discussed in the three telephone conversations of July 9, 11, and 12, 1962?

Appellant has made 12 assignments of error, of which 5 pertain to the trial court's making of certain findings of fact and 4 pertain to the trial court's refusal to make certain findings of fact.

The findings that were made were in support of respondent's theory of the case. They could be summarized as finding that (1) defendant Bosko was interested only in obtaining a bid on the electrical work at the time the bid was submitted to defendant by plaintiff in July, 1962, and that this was the only bid submitted on the electrical portion of the work prior to the bid opening on July 12, 1962; (2) defendant accepted the bid of plaintiff on the electrical work, and after defendants were awarded the general contract by Metro, plaintiff and defendant Bosko negotiated concerning additional work on which they did not reach an agreement; (3) a custom existed in the construction business in the community which was recognized among contractors in the community to the effect that, if a general contractor requested and obtained a subcontractor's price for a portion of the work and used that price in preparing his bid for the prime contract, and thereafter received the prime contract, then the general contractor was bound to use the services of the subcontractor with respect to the phases of work upon which the subcontractor had sub-

mitted a bid to the prime contractor; and the plaintiff submitted his bid with knowledge of and pursuant to this general custom, and that plaintiff remained ready at all times material hereto to perform the work in accordance with its bid, until prevented from doing so by defendant; (4) defendant Bosko had listed plaintiff as the proposed electrical subcontractor, and defendants relied on plaintiff's bid when they submitted their general contract bid to Metro; (5) defendants had so used plaintiff's bid, and under the deducible inferences (from this use) had accepted the plaintiff's bid of $53,124 for the electrical work on the Metro Job 62-4.

The findings that the trial court refused to make were in support of appellant's theory of the case. They could be summarized as findings that:

(1) Plaintiff's price quotation, given prior to bid opening, involved some mechanical work, as well as electrical work, as defined in Metro specifications;

(2) After bid opening, plaintiff and defendant attempted to reach an agreement involving the work previously bid on by plaintiff, and involving additional structural and mechanical work mentioned by Mr. Bosko prior to bid opening, but the parties were not able to reach an agreement;

(3) The custom in the construction business community is that, if a general contractor obtains a subcontractor's price quotation, and the parties agree as to the amount and terms of the price quotation, and the general contractor thereafter used the subcontractor's price in computing his own bid for the prime contract and used the subcontractor's name, and thereafter receives the prime contract, then the subcontractor is awarded the job upon which he gave a price quotation, but there is no evidence that these parties had agreed upon the amount and terms of plaintiff's price quotation at the time said quotation was made, or at the time defendant's bid was submitted to Metro;

(4) Defendants' prime contract bid was computed the day before plaintiff's price quotation was received, and plaintiff's price quotation was not used in defendant Bosko's

computations; and defendants submitted their bid to Metro without any changes after learning of plaintiff's bid.

Each of these competing sets of findings are supportable from the evidence. However, the trial court performed its function in weighing the evidence and concluded that, because of the letter referred to earlier and its use of the word "expand," the court was inclined to believe that the parties had reached an agreement on the amount and details of the bid submitted to defendant by plaintiff in July, but that this expanded quotation included additional work not previously discussed specifically by the parties. The trial court relied heavily on the fact that defendant had written in his bid to Metro the name Industrial Electric as a proposed subcontractor. The trial court then noted that the memory of persons testifying may not be as dependable as the written evidence, and it, therefore, tended to give the written evidence more importance. In other words, the trial court simply did not accept defendants' theory of the case after evaluating the evidence.

■ The rule of law which this court applies in reviewing assignments of error pertaining to findings of fact is applicable to the refusal to make findings as well as to the making of findings. The rule is that, if the findings made by the trial court are supported by substantial evidence in the record, this court can not and will not substitute its own findings (such as appellants' proposed findings) for those of the trial court, even though this court might have resolved the factual dispute the other way and made different or contrary findings, were it the trier of the facts. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

Therefore, the first nine assignments of error, in view of the evidence in the record, cannot provide a basis for reversal of the judgment in this case. We do not intend, by this ruling, to lead anyone to believe we have overlooked the fact that some aspects of these findings may include questions of law. Those will be treated in the following discussion.

Appellants' tenth assignment of error challenges the trial court's conclusions of law 2, 3, 4, and 5. These are necessary formal assignments in order to raise the issue of the admissibility and use of custom evidence in this case. That issue is squarely raised by appellants' assignment of error No. 12, which states that the trial court erred

> In admitting evidence concerning the trade custom, in failing to sustain appellants' objections thereto, and in failing to grant appellants' motions to strike.

Appellants' brief states:

> These assignments all relate to the legal effect, validity and applicability of the custom as a basis for making Conclusions of Law, II, III, IV, and V, the entry of Judgment, the legal conclusions contained in Findings of Fact IX and X and the admissibility of the custom evidence.

Ultimately, the arguments of respondent and appellant in this case require this court to answer the question, "What is the relevance of evidence of custom within a particular business community, with regard to the making of a contract implied in fact?"

In order to answer that question, we believe certain basic rules of contract law pertaining to contracts-implied-in-fact must be kept in mind.

The often quoted rule of law regarding the existence of a contract-implied-in-fact is stated in *Kellogg v. Gleeson,* 27 Wn.2d 501, 505, 178 P.2d 969 (1947):

> " 'A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed *in the light of surrounding circumstances,* and not from their words either spoken or written. Like an express contract, it grows out of the *intentions* of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof.' *Western Oil Refining Co. v. Underwood,* 83 Ind. App. 488, 149 N. E. 85." (Italics ours.)

See, also, *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.,* 49 Wn.2d. 363, 301 P.2d 759 (1956); *Ross v. Raymer,* 32 Wn.2d 128, 201 P.2d 129 (1948); *McKevitt v. Golden Age*

*Breweries, Inc.,* 14 Wn.2d 50, 126 P.2d 1077 (1942), and cases cited therein.

This court is committed to the rule that, unless otherwise limited by the law or public policy, the parties are free to make or not to make a contract, and that whether or not a contract is made by the parties depends on their objective manifestations of intent. When the parties fail to state clearly their intention to make or not to make a contract, their words and actions must be interpreted to determine their intent. The best collection of rules concerning the interpretation of words or actions pertaining to contracts is contained in the Restatement of Contracts. Restatement, Contracts § 226, which explains the concept of interpretation, includes in its comment the following discussion:

> *a.* Questions of interpretation arise not only where there is admittedly a contract, but also where the controversy is whether there is a contract. In determining this, interpretation must often be applied to words and other manifestations of intention as a preliminary to deciding whether an agreement amounts to a contract, or whether words or other manifestations of intention amount to an offer, an acceptance, a rejection, or revocation of an offer.[2]

Restatement, Contracts § 227 explains that:

> A standard of interpretation is the test applied by the law to words and to other manifestations of intention in order to determine the meaning to be given to them.

The comment which follows is very helpful in understanding how, or in what manner "usage" (which term the Restatement of Contracts refers to as "customary practice." Restatement, Contracts § 245) is relevant to intent of the parties. One of the possible standards of interpretation (given in comment *a.2.*) is:

> A standard of limited usage, which would attach the meaning given to language in a particular locality, or by

---

[2] We call attention to the use of the word "agreement" in the quotation, and the fact that in the Restatement of Contracts an agreement is to be distinguished carefully from a "contract." See Restatement, Contracts § 3, defining "agreement," and § 1, defining "contract."

a sect or those engaged in a *particular occupation,* . . . . (Italics ours.)

Comment *a.5.* is also relevant, because when differences of attitude about the existence of a contract arise after the point at which a contract has been made or not made, in order to resolve the differences in testimony and their effect, we can expect to find it necessary to resort to what that comment describes as:

A standard of reasonable expectation, which would attach to words or other manifestations of intention the meaning which the party employing them should reasonably have apprehended that they would convey to the other party; . . . .

The above two standards are "objective" standards. See Restatement, Contracts § 227, comment *b.*

Finally, Restatement, Contracts § 246, Effect of Operative Usages, states:

Operative usages have the effect of

(a) defining the meaning of the words of the agreement or the meaning of other manifestations of intention,[3]
   . . . .

Restatement, Contracts § 247 states:

A usage is operative upon parties to a transaction where and only where

(a) they manifest to each other an assent that the usage shall be operative, or

(b) *either party intends the effect of his words or other acts to be governed by the usage, and the other party knows or has reason to know this intention, or*

(c) *the usage exists in such transactions and each party knows of the usage or it is generally known by persons under similar circumstances, unless either party knows or has reason to know that the other party has an intention inconsistent with the usage.*
   (Italics ours.)

---

[3]We emphasize, again, that the use of the words "agreement" in the quoted passage of the Restatement of Contracts does not mean the same as the word "contract." See footnote 2.

We believe that this section in particular must be read in the light of the comment applicable to that section, although we do not feel it necessary to discuss the comment.

Restatement, Contracts § 248 states:

(2) Where both parties to a transaction are engaged in the same occupation, or belong to the same group of persons, the usages of that occupation or group are operative, unless one of the parties knows or has reason to know that the other party has an inconsistent intention.

■ We believe, on the basis of the discussion of the Restatement of Contracts on this area of contract law; that "custom" (as this word has been used by the parties in this case) is admissible to show the meaning of the words and acts of the parties in the sense that we normally mean by the term "objective manifestations of intent."

We, therefore, conclude that evidence of custom is admissible because it is relevant to the issue of the intent of the parties. Accordingly, we hold that appellants' twelfth assignment of error is without merit.

Assignment of error No. 10 (referred to previously) challenges the validity of conclusions of law 2, 3, 4, and 5, which read:

II. That plaintiff's bid to defendants on the electrical work was an offer from plaintiff to defendants to do the electrical work for the price given, on the condition that defendants obtained the prime contract. That the usage and custom in the contracting trade became part of the offer made by the plaintiff to the defendants.

III. That defendants accepted plaintiff's offer to do the electrical work and upon being awarded the prime contract there was a contractual obligation for defendants to employ plaintiff to perform all the electrical work on the Metro job 62-4 for the price of $53,124.00.

IV. That defendants breached their contract with the plaintiff by refusing to allow plaintiff to perform the electrical work on project 62-4.

V. That plaintiff should have judgment against the defendants Nick Bosko, d/b/a Bosko Engineering and S. L. Rowland Construction Company, d/b/a Bosko Engineering and S. L. Rowland Construction Company, and each

of them for its loss of profit due to defendants' breach in the amount of $6,549.00.

██ The argument supporting this assignment is principally based on our own case of *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 301 P.2d 759 (1956), as authority for the proposition that "custom" does not and can not make a contract for the parties.

That case, as we read it, is properly to be understood as a case in which there was *no* evidence of *acceptance* of the offer of the subcontractor *other than* the purported *use* of the bid, and custom. There was no proof or showing that the general contractor was reasonably understood by the subcontractor to have accepted the bid-offer, in the light of custom. The subcontractor attempted to equate "custom" with law, in disregard of the communication from the general contractor that his bid had not been accepted, even though the bid had mistakenly been used, and was not acceptable because it was not the lowest and best bid.

In the case at bar, on the other hand, there was considerable evidence of a series of communications between the parties which resulted in some understanding or agreement, in addition to the use of the figures supplied by Mr. Bayley, and the evidence of custom. This is a very important factual distinction. '

The opinion in *Milone & Tucci, Inc. v. Bona Fide Builders, Inc., supra,* has been recently clarified by this court in *Plumbing Shop, Inc. v. Pitts, ante* p. 514, 408 P.2d 382 (1965). In that opinion, we stated:

In *Milone & Tucci v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 301 P.2d 759 (1956), we stated that the mere use of a subcontractor's bid figures by the general contractor in preparing his bid does not constitute an acceptance of the subcontractor's offer. With respect to the role of custom and usage in implied contract litigation, we stated:

Usage and custom are admissible in evidence to explain the terms of an express or implied contract once the contract is established. The fallacy of the trial court's second theory is that an implied contract cannot *arise* from proof of usage and custom. The ef-

fect of custom or usage upon contractual obligations is dependent upon the existence of an actual contract between the parties. Where there is no contract, proof of usage and custom will not make one. (p. 366.)

The above statement is unduly restrictive if it is interpreted to mean that usage and custom are not to be considered where the question before the court is the existence of an implied-in-fact contract. Business practice and custom may be used in the implication process as well as in the interpretation of existing contracts, but its role is not to fill in all the essential terms of an incomplete agreement.

We believe a proper understanding of the significance of "usage" (as the Restatement of Contracts defines it) or "custom" (as the word was used by the parties in this case, and this court in the *Milone & Tucci, Inc.* case, *supra*, and the *Plumbing Shop, Inc.* case, *supra*) is that it is *one* of the *surrounding circumstances* which must be considered in applying the general rule quoted above that:

" 'A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, . . . .' " *Kellogg v. Gleeson,* 27 Wn.2d 501, 505, 178 P.2d 969 (1947)

We believe the sections of the Restatement of Contracts cited above are supported by the two leading treatises in contract law.[4]

It is particularly persuasive to this court that both of these authorities agree that evidence of "usage" or "custom" is admissible and relevant to prove or disprove the existence of a contract. Characteristic of their attitude is the statement in 4 Williston, Contracts § 600A, p. 288 (3d ed. 1961), which reads:

"The general rule governing the interpretation of contracts applies not only where there is an admitted con-

---

[4] 1 Williston, Contracts § 22A, pp. 49-51 (3d ed. 1957). 4 Williston, Contracts § 600A, p. 288, n. 12; § 603, p. 334, n. 2; § 605, pp. 358, 359, 362, 363 (3d ed. 1961). 5 Williston, Contracts § 648, p. 6, n. 19; § 649, pp. 14 and 15, n. 19; § 651, pp. 36 and 37, n. 15 (3d ed. 1961). 1 Corbin, Contracts § 18, pp. 39-42 (1963); 3 Corbin, Contracts § 536, pp. 33-38; § 537, pp. 45, 47, and especially 48; § 538, pp. 58-63, pp. 66-70; § 542A, p. 129; § 555, pp. 228-238 (1960).

tract under consideration, but also where the controversy is whether there is a contract. Whether the parties are merely negotiating a contract, or entering into a present contract, is purely a question of intention." (Footnotes omitted.)

For these several reasons, we find that appellants' argument based on *Milone & Tucci, Inc. v. Bona Fide Builders, Inc., supra,* is unpersuasive, and we, therefore, conclude that assignment of error No. 10 is without merit.

Appellants have argued that the findings of fact in which the trial court found that there was an acceptance by Mr. Bosko were actually conclusions of law. We agree to the extent that these are *mixed* findings of fact and conclusions of law. As we view findings of fact No. 9 and No. 10, the trial court was weighing the statements and acts of the parties prior to and subsequent to the bid openings on July 12, 1962, in an effort to determine the objective manifestations of intent exhibited by each party to the other.

We are of the opinion that in our discussion of the law applicable to this case we have disposed of appellants' contention that this court must redecide the issues inherently resolved by findings of fact No. 9 and No. 10. Whether Mr. Bosko "accepted" the bid-offer of Mr. Bayley depended on how the trier of the facts viewed the objective manifestations of intent exhibited by the parties to each other in the light of the surrounding circumstances.

Assignment of error No. 11 asserts that the trial court erred in entering the judgment appealed from. This assignment is answered by what we have said above.

This court, for the reasons stated herein, finds that the trial court did not err as to any of the matters to which appellants have assigned error. Therefore, the trial court's judgment is hereby affirmed.

ROSELLINI, C. J., OTT, HUNTER, and HALE, JJ., concur.