HOLMAN ERECTION COMPANY,
Appellant,

v.

ORVILLE E. MADSEN & SONS,
INC., Respondent.

No. C2–82–926.

Supreme Court of Minnesota.

March 4, 1983.

Dosland, Dosland & Nordhougen, Moorhead, for appellant.

Briggs & Morgan, Steven Halverson, St. Paul, for respondent.

YETKA, Justice.

Plaintiff-appellant Holman Erection Company (Holman) commenced an action against Orville Madsen & Sons, Inc., (Madsen), alleging that Madsen had breached a construction contract. Holman claims that Madsen accepted Holman's bid on a subcontract, and thereby formed a contract, by listing Holman as a proposed subcontractor in a general contract bid Madsen submitted to the City of Moorhead. Holman sought the profits it argued it had lost when Madsen awarded the subcontract to a different construction company.

The Clay County District Court granted Madsen's motion for summary judgment. Holman appeals from the order and judgment dismissing Holman's claim. We affirm.

The facts of this case are undisputed. The City of Moorhead, Minnesota, advertised for bids to build a wastewater treatment facility. Bids from general contractors were to be opened at a public meeting of the governing body on January 22, 1981, pursuant to Minn.Stat. § 471.705 (1982). Madsen decided to bid on the general contract for the project. It sent bid invitations

to potential subcontractors, including Holman. Shortly before the general contract bids were due to the City of Moorhead, Madsen received a bid from Holman. The bid was taken over the telephone. It is normal practice in the construction industry for subcontractors to submit bids shortly before the general bid is due, as was done here. This procedure is intended to prevent the general contractor from "bid shopping," a practice whereby the general takes a subcontractor's bid and uses it as leverage to obtain lower bids from other potential subcontractors. *See* Closen & Weiland, *The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and Other Theories to the Relations Between General Contractors and Subcontractors,* 13 J.Mar.L.Rev. 565, 574–77 (1980).

When Holman phoned in its bid, information on the total price and work included in the bid was written down on a note pad by someone at Madsen's office in Hudson, Wisconsin, and relayed to Madsen's representatives in Moorhead. The bid was received 2–3 hours before the general bid was due to the city. Holman also submitted bids to six other general contractors that were bidding on the same project. The identical bid was made to each general. The work and expense involved in developing a bid is not segregated by subcontractors to individual general contractors.

Madsen utilized Holman's bid, as well as past experience, in preparing its bid for the general contract. The city required general contractors to list all proposed subcontractors on their prime bids to the city. Holman was listed on Madsen's bid as the subcontractor for the steel erection portion of the project. This portion accounted for 2% of the total project. Other than taking Holman's bid over the telephone, no one at Madsen ever spoke to Holman about the bid, any potential contract or the project in general until Holman called Madsen after the subcontracts had already been awarded.

The bids of all the general contractors were opened by the city on January 22, 1981. On February 2, 1981, Madsen was awarded the prime contract.

Following award of the contract, Madsen began entering into subcontracts with various subcontractors. At this stage of the process, limited negotiation takes place with the subcontractors. Items are clarified and written contracts are executed. Instead of contacting Holman to finalize arrangements for steel erection, Madsen discussed this aspect of the contract with Van Knight Steel Erection, Inc. (Van Knight), a different steel erection subcontract bidder. Madsen sent Van Knight a letter, stating that Van Knight's bid was being reviewed. Madsen requested information on Van Knight's status and qualification as a minority business. The contract with the City of Moorhead required that an effort be made to have a portion of the work done by minority business enterprises, pursuant to federal regulations.

Madsen eventually awarded the steel erection subcontract to Van Knight. Van Knight also agreed to supply a substantial amount of materials and some labor not included in Holman's bid.

Holman learned from one of the other general contract bidders that Madsen had been the low general bidder and that Holman had been the low sub-bidder for steel erection. When Holman also discovered that it had been listed as a proposed subcontractor in Madsen's bid, it called Madsen and was told that the subcontract was going to a different company. Madsen at no time indicated to Holman that Holman was to get the contract. Other than the two phone conversations—the first when Holman called in its bid; the second after Holman's discovery—no other communication, written or oral, occurred between Holman and Madsen.

Holman brought suit against Madsen, alleging that Madsen had accepted Holman's sub-bid on the wastewater treatment project and had thus formed a binding contract which it breached by awarding the subcontract to a different company.

The Clay County District Court found that no contract had been created between the parties and granted summary judgment.

The two issues on appeal are:

1. Is a contract formed between a general contractor and a subcontractor when the general submits a bid on a public construction project and lists the subcontractor as the proposed subcontractor for one aspect of the project as required by the awarding authority and the general subsequently wins the contract and awards the subcontract to a different subcontractor?

2. Did the lower court err in granting summary judgment in favor of the general contractor?

Appellant Holman argues that a binding contractual relationship was created between it and Madsen when Madsen utilized Holman's sub-bid in its general bid for the waste treatment plant project and listed Holman as a proposed subcontractor for steel erection work. Does the act of listing Holman in the general bid constitute an acceptance of Holman's offer to do the work when no other communication occurred after the offer and prior to the substitution of a different subcontractor? We think not.

■ To constitute an acceptance, Madsen's acts must be deemed a manifestation of assent when evaluated under an objective standard. *See Capitol Warehouse Co. v. McGill-Warner-Farnham Co.,* 276 Minn. 108, 114, 149 N.W.2d 31, 35 (1967). The form of the assent, whether it be written, oral, or by conduct, is not relevant as long as objective standards are applied and the essential finding of mutual assent is made. *See Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild,* 302 Minn. 476, 479, 225 N.W.2d 261, 263 (1975). The Restatement (Second) of Contracts § 19 (1979) provides:

(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

Comment c to section 19 provides:

[E]ven though the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents.

■ Holman argues that listing Holman as a subcontractor, as required by the awarding authority, constitutes an acceptance because: 1) there is no other reasonable explanation for the act; 2) it is unfair to bind Holman to its bid without binding Madsen to use it; and 3) Madsen knew the general bid was public record pursuant to statutes. Since Madsen knew Holman could discover that Holman had been listed in the general bid, Holman argues that the inference can be drawn that Madsen intended to accept Holman's offer and communicated the assent by listing Holman in the general bid.

Appellant's argument flies in the face of a large body of precedent holding that no contract is formed by the listing of a subcontractor in a general contractor's bid. There is no case in Minnesota that deals precisely with the issue presented. This court has held, however, that the subcontractor may be bound to his bid as submitted to the general contractor by operation of promissory estoppel. *See Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 190 N.W.2d 71 (1971).

In *Mitchell v. Siqueiros,* 99 Idaho 396, 582 P.2d 1074 (1978), the general contractor had listed the subcontractor in its bid for construction of a school. The listing of proposed subcontractors was required by statute. After winning the contract, the general tendered a written contract to the subcontractor. It was then discovered that the subcontractor had not procured a required license. The general then hired a different, more costly, subcontractor and sued the original subcontractor to recover the increased costs. The court discussed the

existing case law at some length and concluded:

> It is a settled common law contract principle that utilizing a subcontractor's bid in submitting the prime or general contract bid does not, without more, constitute an acceptance of the subcontractor's offer conditioned upon being awarded the general contract by the awarding authority. * * * Unless the facts otherwise disclose, utilizing respondent's bid was not by itself an acceptance of the subcontract bid offer.

*Id.* at 399, 582 P.2d at 1077 (citations omitted).

The Idaho court also specifically addressed the statutorily mandated listing of proposed subcontractors and concluded that the statute did not confer a legal contractual status on the named subcontractor. *Id.* at 401, 582 P.2d at 1079.

California courts have addressed the precise issue presented here in several cases. The only significant distinguishing characteristic is that a statute required the listing of proposed subcontractors. In the present case, the listing was required by the awarding authority, but not by statute. In *Klose v. Sequoia Union High School District,* 118 Cal.App.2d 636, 258 P.2d 515 (1953), the general contractor mistakenly included the wrong subcontractor in its bid and, after winning the contract, substituted a different subcontractor for the one listed. A member of the school district sued the general contractor, seeking imposition of the statutory penalty for wrongful substitution. The court stated:

> Petitioner's arguments are necessarily predicated upon the concept that a subcontractor, whose name is submitted with the bid of the general contractor, in some undefined way, secures some legal rights when the general contractor's bid is accepted by the awarding authority. In the absence of statute that is not the law. A subcontractor bidder merely makes an offer that is converted into a contract by a regularly communicated acceptance conveyed to him by the general contractor. No contractual relationship is created be-

tween the subcontractor and the general contractor even though the bid is used as part of the general overall bid by the general contractor and accepted by the awarding authority.

*Id.* at 640–41, 258 P.2d at 517.

In *Southern Cal. Acoustics Co. v. C. V. Holder, Inc.,* 71 Cal.2d 719, 71 Cal.Rptr. 319, 456 P.2d 975 (1969), the California Supreme Court reaffirmed *Klose,* holding that the listing of a subcontractor does not constitute an acceptance or confer any contract rights. The court did, however, leave open a possible statutory remedy if the substitution was in violation of the governing statute. *See also Interior Systems, Inc. v. Del. E. Webb Corp.,* 121 Cal.App.3d 312, 175 Cal.Rptr. 301 (1981).

In *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.,* 49 Wash.2d 363, 301 P.2d 759 (1956), the Washington Supreme Court held that the mere use of the subcontractor's figures did not constitute an acceptance of the subcontractor's offer, despite the fact that the general requested the subcontractor's bid. In *Corbin-Dykes Electric Co. v. Burr,* 18 Ariz.App. 101, 500 P.2d 632 (1972), the Arizona Court of Appeals held that a subcontractor's bid was nothing more than an offer to perform, not ripening into a contract until voluntarily accepted, and that the use of the subcontractor's bid in the general bid did not constitute a manifestation of assent.

Two federal circuit court cases have held that no contract is created by the general's use or listing of the subcontractor's bid even where the general communicated directly to the subcontractor that its bid had been used. *See Merritt-Chapman & Scott Corp. v. Gunderson Bros. Engineering Corp.,* 305 F.2d 659 (9th Cir.1962); *Williams v. Favret,* 161 F.2d 822 (5th Cir.1947). Other cases have held that even more than acceptance is required to bind the general. *See Savoca Masonry Co. v. Homes & Son Constr. Co., Inc.,* 112 Ariz. 392, 542 P.2d 817 (1975) (requiring mutual obligations); *Plumbing Shop, Inc. v. Pitts,* 67 Wash.2d 514, 408 P.2d 382 (Wash.1965) (requiring "substantial degree of specificity"); *Frank*

*Sullivan Co. v. Midwest Sheet Metal Works,* 335 F.2d 33 (8th Cir.1964) (requiring mutual assent on all material terms).

Holman attempts to distinguish the vast authority that holds in opposition to its position by pointing to factual differences between those cases and the instant case. While mistake, inadvertence, and other distinguishing facts are present in the cases, the courts' decisions did not turn on these elements. The holdings applied the general law of contracts, not resting on the types of facts highlighted by appellant. In the present case, the subcontractor has shown no reliance, additional communications or detriment stemming from the substitution of a different subcontractor. Further, Madsen had a legitimate reason for substituting a different subcontractor for Holman, that is, complying with federal Minority Business Enterprise (MBE) regulations. The mere absence of mistake, fraud or incapability of the subcontractor has no determinative effect on the resolution of the contract formation issue.

While commentators have urged that a general contractor be bound to a listed subcontractor upon the mere listing or use of the subcontractor's bid in the general bid on several theories, we do not adopt the reasoning. *See, e.g.,* Note, *Another Look at Construction Bidding and Contracts at Formation,* 53 Va.L.Rev. 1720 (1967); Note, *Once Around the Flag Pole: Construction Bidding and Contracts at Formation,* 39 N.Y.U.L.Rev. 816 (1964); *see also* Closen & Weiland, *supra* at 605 (urging legislative action to regulate the public bidding process). One theory requires a factual inquiry into the circumstances surrounding the relationship of the general contractor and subcontractor. It would find that a contract exists unless: 1) the sub-bid is not responsive to the plans and specifications embodied in the overall project; or 2) the subcontractor is shown to be unreliable or incapable of performing his side of the bargain without unreasonably complicating the general's position. This approach rests on a supposedly objective and realistic examination of construction industry bidding practices and emphasizes "factual realities."

The dominant policy justification is said to be the avoidance of bid-shopping while not unnecessarily restricting the freedom of general contractors.

A second analysis rests on an analogy to the Uniform Commercial Code. The UCC provides a more liberal standard for formation of contracts than does the common law of contracts and allows any reasonable manner of acceptance to bind both promisor and promisee. *See* Minn.Stat. § 336.2–206 (1982). It is argued that the court must look to the "fulcrum point of agreement" to determine when the parties are bound. The factual context of general/subcontractor agreements is said to compel the conclusion that since the parties consider themselves bound at the time the general utilizes the subcontractor's bid, this intent should be enforceable.

The broad policy justifications advanced for binding the general to the subcontractor upon utilization or listing of the subcontractor in the general bid include:

1) limiting bargaining to the pre-award stage to put the general and the sub on equal footing as to any subsequent negotiation or modification of the initial agreement;

2) providing certainty in the industry;

3) avoiding bid-shopping;

4) providing formality and allowing the commercial context to supply the necessary fact basis; and

5) allowing for necessary negotiation on open terms, the only binding terms being the price and the nature of the work bid on.

Underlying all of the above justifications is a superficial equity notion. In Minnesota, as well as most other jurisdictions, the subcontractor may be obligated to perform by application of promissory estoppel. The general, however, remains free to avoid the listed subcontractor and negotiate with other subcontractors. This one-sided arrangement seems, on its face, unfair. Why should one party be bound and other not? A close examination of the construction business and the nature of the bidding

process, however, reveals several justifications for the unequal treatment of generals and subcontractors.

First, the reason a subcontractor is bound by its bid is the existence of justifiable reliance by the general on the subcontractor's price for specified work. The general makes his bid after gathering and evaluating a number of subcontract bids. Once the general wins the prime contract from the awarding authority, he is bound to his own bid. For the subcontractor to be able to refuse to perform would subject the general to a financial detriment. *See Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 120, 190 N.W.2d 71, 75–76 (1971).

In contrast, the subcontractor does not rely on the general and suffers no detriment. A subcontractor submits bids to all or most of the general contractors that it knows are bidding on a project. The subcontractor receives invitations to bid from some generals and submits bids to others without invitation. The time and expense involved in preparing the bid is not segregated to any particular general. The total cost is part of the overhead of doing business. The same bid is submitted to each general. Thus, whether or not any particular general wins the contract is of little or no concern to the subcontractor. The subcontractor engages in the same work and expense in preparing its bid regardless of who wins the general contract and whether the subcontractor wins the contract on which it bid. No further expense is incurred until a formal agreement is reached with the general and actual work commences. Clearly, the promissory estoppel concept is not applicable in this situation. *Bostrom* bound the subcontractor to his bid not on the basis of a contract, but on the basis of estoppel. With no detrimental reliance, there can be no estoppel claim. Ample justification exists for binding the subcontractor and not binding the general. The two situations are very different.

Second, the nature of the bidding process compels allowing the general sufficient leeway to maintain its flexibility in executing

subcontracts and selecting the subcontractors it will hire for a project. Typically, subcontractors submit their bids only a few hours before the general bid must be submitted to the awarding authority. The general's representatives take the bids over the telephone and hurriedly compile their own bid. This period of time is hectic and complex. The bids received consist of the contract price and a listing of work included. Specifics are left for future negotiation and clarification.

The last-minute procedure is designed to prevent bid-shopping. This court has recognized the undesirable nature of bid-shopping, *Bostrom,* 291 Minn. at 121, 190 N.W.2d at 76, and the last-minute bidding process seems well entrenched in the construction industry. *See Hoel-Steffen Construction Co. v. United States,* 684 F.2d 843, 849 (Ct.Cl.1982).

The bidding process puts the subcontractor and the general in very different positions as to the content of the subcontract. The subcontractors have the luxury of preparing their bids on their own timetable, subject only to the deadline for submitting their bids to the general contractors. The same bid goes to all the general contractors and covers the same work. The generals, on the other hand, are dealing with all the various construction aspects of the project and with numerous potential subcontractors. They compile their bids, as the various subcontractor bids are received, within a few hours of the deadline for submission of the prime bid. Specifics are necessarily given less than thorough consideration and are left for future negotiations. Finally, the lowest dollar amount bidder is not always the one chosen to do the work or the one listed as the potential subcontractor. Reliability, quality of work, and capability to handle the job are all considerations weighed by the general in choosing subcontractors. MBE regulations requiring an effort to use a percentage of minority contractors are another potential consideration.

Binding general contractors to subcontractors because a particular bid was listed in the general bid or was utilized in making

the bid would remove a considerable degree of needed flexibility. The present case illustrates the consequences quite well. Because the project involved was a public project, MBE regulations required that an effort be made to use minority contractors. When Madsen began to put the specifics of the project together, it was forced to juggle the subcontracts in order to comply with the MBE regulations. Van Knight, the subcontractor chosen instead of Holman, qualified as a minority business and offered to supply materials and supplies not included in Holman's bid. Despite a slightly higher cost, Madsen selected Van Knight as the steel erection subcontractor.

If Madsen was bound to the bids listed in its prime bid, there is a possibility that the contract would have been lost due to failure to comply with MBE regulations. The next highest qualifying bidder would then have been selected, to the awarding authority's greater expense and to Madsen's detriment. Such a result imposes a greater cost on the project and a loss to the general contractor. The result under the prevailing law in most jurisdictions, and which we adopt here, would not impose any additional expenses on the rejected subcontractor.

A decision in favor of the subcontractor on this issue would place Minnesota in a minority position as perhaps the sole state to hold that a contract is formed by the mere listing of a subcontractor in a general contractor's bid to the awarding authority. Although supplying some certainty and symmetry to the construction industry, such a decision would also impose a rigidity on the process and result in greater cost to awarding authorities and potential detriment to general contractors. If such a change is to take place, it is one properly brought before the legislature.

Appellant argues that despite the lack of dispute over the facts, summary judgment is inappropriate because the fact-finder could infer that a contract had been formed.

The lower court concluded that the mere listing of a subcontractor's name by a general contractor in its bid to the awarding authority does not create a contract between the subcontractor and the general contractor. Since that conclusion is affirmed by this court, summary judgment was clearly appropriate. The facts are not in dispute and no inferences can be drawn from those facts that change the result. The trial court is thus affirmed.