FINNEY COMPANY, INC., Movant,

v.

MONARCH CONSTRUCTION CO., INC., Respondent.

Supreme Court of Kentucky.

June 14, 1984.

Walter R. Morris, Jr., Gess, Mattingly, Saunier & Atchison, Lexington, for movant.

G. Benjamin Cowgill, Brown, Sledd & McCann, Lexington, for respondent.

GANT, Justice.

In December, 1980, the Commonwealth of Kentucky advertised for bids for construction of the Primary-Ambulatory Care Center at the University of Kentucky hospital, to which invitation the respondent, Monarch Construction Co., Inc., a general contractor, elected to respond. As is customary, the general contractor mailed notices to many potential subcontractors for various phases of the work, furnishing them with the requirements and specifications for the job. One of these was the movant, Finney Company, Inc., which was and is in the heating, ventilating, air conditioning and plumbing business. After two telephone calls between the parties, Finney made a verbal proposal of $2,220,000, which figure was included in Monarch's total bid of $11,337,000. This oral offer was made by telephone within less than ten minutes of the "bid opening" at 2 p.m., February 5, 1981. At 4:30 p.m. on that date Finney learned from the consulting engineers that the bid of Monarch had been accepted. Finney apparently also learned that its name was one of two names listed by Monarch for the plumbing, heating, ventilating and air conditioning phase of the work.

The practice of submitting the names of proposed contractors should be examined at this time. The requirement for listing is set out in the "Instruction to Bidders" and "General Conditions" issued to all prospective general contractors, which documents state that the name of each proposed subcontractor shall be submitted with the proposal and that no subcontractor may be employed or substituted without the approval of the Department of Finance, Division of Contracting & Administration. The sole evidence herein relating to this procedure is that the requirement has the purpose of assisting the Division in its evaluation of bids, and other portions of the above documents specifically provide that no contractual relationship shall arise between the Division and the subcontractor by submission of its name by the general contractor.

On February 9, 1981, Monarch contacted Finney and asked for written confirmation of its oral bid. This confirmation was sent by Finney and received by Monarch on February 12. The written confirmation became the subject matter of a meeting between the parties on March 2, 1981. The written confirmation excluded one major item and 11 lesser items which Monarch contended, and the trial court found, were included in the oral bid of February 5. Additionally, the Commonwealth had accepted all the alternates listed on the contract, and Finney's bid on these alternates

was higher than other bids received by Monarch.

At the March 2 conference the parties sought to resolve the differences, and Finney was informed that, after the exclusion of the items in its written confirmation and the inclusion of the alternates, its bid was $80,000 higher than that of Aztec, another bidder. Finney contacted its own material-man and subcontractors and agreed to perform some of the omitted items and lowered its bid by some $22,000, this being communicated to Monarch on March 6. Monarch, pursuant to the requirements of the Commonwealth, secured permission to substitute the lower bidder, Aztec, and did so.

Two other bits of evidence were fed into the factual grinder which movant would rely upon. First, Finney learned from the consulting engineers that in its original bid Monarch had listed both Finney and Aztec as subcontractors for the plumbing, heating, ventilating and air conditioning, but had deleted the name of Aztec when informed by the Commonwealth that only one name could be listed. Finney also learned from the same consulting engineers that there was to be a meeting of the general contractor and all subcontractors on March 3, which meeting it attended. However, it had not been notified of the meeting by Monarch, even though they had spent the previous day in the price-haggling session.

Finney filed this action against Monarch and against the Commonwealth and certain agents thereof on five separate theories, to-wit: (a) express contract; (b) implied contract; (c) third party beneficiary; (d) constructive or quasi contract, and (e) promissory estoppel. On appeal, Finney has abandoned the third party beneficiary aspect of its contention and has appealed the summary judgment awarded Monarch. We affirm the Court of Appeals, which affirmed the Franklin Circuit Court.

■ On this appeal, Finney argues that a contract existed between Monarch and Finney and that it should recover damages for the breach thereof. The basic question confronting this court is whether the incorporation of the name and amount of bid of a subcontractor by a general or prime contractor in its bid to the owner constitutes an acceptance which would create a contractual relationship between the general contractor and the subcontractor should the general contractor become the successful bidder. Our answer is that in the absence of a contrary statute, it does not. We are unable to find a single case to the contrary. The following cases hold that, under the stated question, there is no contractual relationship created: *Holman Erection Company v. Orville E. Madsen & Sons, Inc.,* Minn., 330 N.W.2d 693 (1983); *Interior Systems, Inc. v. Del E. Webb Corporation,* 121 Cal.App.3d 312, 175 Cal. Rptr. 301 (1981); *Mitchell v. Siqueiros,* 99 Idaho 396, 582 P.2d 1074 (1978); *K.L. House Construction Company, Inc. v. Watson,* 84 N.M. 783, 508 P.2d 592 (1973); *Corbin-Dykes Electric Company v. Burr,* 18 Ariz.App. 101, 500 P.2d 632 (1972); *Southern California Acoustics Company, Inc. v. C.V. Holder, Inc.,* 71 Cal.2d 719, 79 Cal.Rptr. 319, 456 P.2d 975 (1969); *C.H. Leavell and Company v. Grafe & Associates, Inc.,* 90 Idaho 502, 414 P.2d 873 (1966); *Cortland Asbestos Products, Inc. v. J & K Plumbing and Heating Company, Inc.,* 33 A.D.2d 11, 304 N.Y.S.2d 694 (1969); *Plumbing Shop, Inc. v. Pitts,* 67 Wash.2d 514, 408 P.2d 382 (1965); *N. Litterio & Company, Inc. v. Glassman Construction Company, Inc.,* (D.C.Cir.1963), 319 F.2d 736; *Universal Construction Company v. Arizona Consolidated Masonry & Plastering Contractors Ass'n,* 93 Ariz. 4, 377 P.2d 1017 (1963); *Merritt-Chapman and Scott Corporation v. Gunderson Brothers Engineering Corporation* (9th Cir.1962), 305 F.2d 659; *Milone and Tucci v. Bona Fide Builders,* 49 Wash.2d 363, 301 P.2d 759 (1956); *Klose v. Sequoia Union High School District,* 118 Cal.App.2d 636, 258 P.2d 515 (1953); *R.J. Daum Construction Company v. Child,* 122 Utah 194, 247 P.2d 817 (1952), and *Williams v. Favret* (5th Cir.1947), 161 F.2d 822.

The general and universal rule is stated in *Klose, supra,* 258 P.2d at 517–518, when the court states:

> A subcontractor bidder merely makes an offer that is converted into a contract by a regularly communicated acceptance conveyed to him by the general contractor. No contractual relationship is created between the subcontractor and the general contractor even though the bid is used as a part of the general over-all bid by the general contractor and accepted by the awarding authority.

Movant cites two cases which he contends are contrary to the general rule, to-wit: *Industrial Electric-Seattle, Inc. v. Bosko,* 67 Wash.2d 783, 410 P.2d 10 (1966), and *Loranger Construction Corporation v. E.F. Hauserman Company,* 376 Mass. 757, 384 N.E.2d 176 (1978). However, these cases are readily distinguishable because of evidence of a series of communications between the parties which indicated an acceptance or agreement, and the *Bosko* case even went so far as to affirm *Milone, supra,* in which the Massachusetts court held that the mere listing or using the bid does not create a contract.

■ In the instant case, there were no actions or communications by Monarch which would give rise to any exception to the general rule. The only communication was a request from Monarch that Finney confirm its oral bid in writing, which confirmation was found by the trial court to contain material deviations. Any other information relating to the position of Finney or occasioning meetings with other subcontractors, etc., came from others. Indeed, Finney complains of actions on one hand and inaction on the other, but the mere passage of two weeks between the date Monarch signed the contract for construction and the meeting between the parties at which Finney was informed that it was not the low bidder, taken alone, can hardly be categorized as fatal inaction.

Movant also relies on a doctrine which he denominates "the rule of mutuality of contract." In so doing, he cites two cases— *Meade Construction Company, Inc. v. Mansfield Commercial Electric, Inc.,* Ky., 579 S.W.2d 105 (1979), and *Harry Harris, Inc. v. Quality Construction Company of Benton, Kentucky,* Ky.App., 593 S.W.2d 872 (1979). Each of these cases held that, when a subcontractor submits a quotation to a general contractor for use in the computation of the latter's bid, it is bound thereby if that bid is relied upon to the detriment of the general contractor. We are certain that the *lack* of mutuality of obligation was argued in both those cases, but it is our opinion that, despite certain isolated statements which might indicate to the contrary, both *Meade* and *Harris* were founded in equity, not contract. In fact, both opinions consistently used the words "fairness" and "equity." They were not based on contract law, which is relied upon herein. Despite their disclaimer of promissory estoppel, this court, in *Meade,* utilized the word "reliance," an element of estoppel, to reach its conclusion.

Finney basically asks: "Why should the subcontractor be bound and the general contractor not be bound?" The case before us furnishes a classic example to reach the answer to this question. Herein, Finney was furnished complete plans and specifications for the plumbing, heating, ventilation and air conditioning phase of the project. After considerable study, planning and technical consultations, Finney's bid was submitted orally some ten minutes before the "letting." There was no element of reliance by the subcontractor upon the general contractor. There was, however, reliance by the general contractor upon the subcontractor. Further, this contract was advertised with a basic bid, together with numerous alternates, as is customary in the trade. The obvious purpose for utilizing alternates is to permit the owner to evaluate the bids in order to determine just what construction can be performed for the available funds. When the alternates were utilized by the owner, the subcontractor, which may have been the low bidder for the base price, may well become the high bidder, as in this case.

It is obvious that a great amount of flexibility must be maintained in the bidding process. To adopt the position urged by the movant herein would impose an unacceptable rigidity upon the bidding process. For an excellent discussion of the problem, see *Holman Electric Company v. Orville E. Madsen & Sons, Inc.*, Minn., 330 N.W.2d 693 (1983). As the court stated in that case, if we are to make such a change in basic contract law, "it is one properly brought before the legislature."

The trial court and the Court of Appeals are affirmed.

All concur except STEPHENS, C.J., who dissents and files herewith a dissenting opinion.

STEPHENS, Chief Justice, dissenting.

Today the Court has taken a position that in effect sanctions the business practice commonly known as "bid shopping."

The majority has done so by adhering to the antiquated notion that although the subcontractor is bound to perform once he submits a bid to the general contractor, the general contractor, on the other hand, is not similarly bound to the subcontractor. In so holding, this Court has strapped itself into judicial blinkers. It is obvious, given a broader and more realistic perspective, that when all the circumstances alleged by Finney are considered they are sufficient to establish that Monarch did accept Finney's bid and thus should be bound thereby. Moreover, the Court has taken this action in contravention of the law it established in the recent contract case of *Meade Construction Company, Inc. v. Mansfield Commercial Electric, Inc.*, Ky., 579 S.W.2d 105 (1979). The holding in that case, coupled with the facts in the present one, necessitates that, at the very least, this case should be remanded to the trial court for a jury trial. Here, summary judgment is entirely inappropriate.

In *Meade, supra,* we decided that a subcontractor, Mansfield, was bound to perform for a general contractor, Meade, when the general had used the apparently low bid of the subcontractor in preparing its successful overall bid for a construction project. We held that the general contractor did have a binding contract with the subcontractor and that therefore the subcontractor was liable to the general contractor for damages caused by the subcontractor's refusal to honor its subcontract bid.

I write this fully recognizing that in *Meade* the general contractor was trying to bind the subcontractor whereas in the case at bar the subcontractor is trying to bind the general contractor. However, despite the individual facts of each case, the general principles of law articulated in *Meade* should apply herein. No logical reason exists that reasonably justifies a separate set of laws for general contractors than those which apply to subcontractors.

The holding in *Meade* was not based upon the doctrine of promissory estoppel. After having declined to use the doctrine of promissory estoppel the Court then articulated the contractual and equitable rationales it *did* use to find that a binding contract existed. The law that this Court applied was explicitly laid out when the Court said:

> Suffice it to say that under any conception of *fairness* and *equity*, one who submits a quotation for the purpose of its being used in the computation of a bid for a contract *should be bound, when the contract is awarded* pursuant to a bid prepared in *reasonably foreseeable reliance* on that question, to accept an agreement in conformity with the question. Id., at p. *106* (Emphasis added.)

In short, the Court in *Meade* established a two-pronged test for determining whether a binding contract exists between a subcontractor and a general contractor at the time "... when the [overall] contract is awarded...." The two prongs of the test are: (1) *fairness and equity* and (2) *reasonably foreseeable reliance* by the one party upon the actions taken by the other party.

After having established the two-pronged test the Court then went on to

explain how it found the second prong, "reasonably foreseeable reliance", to exist. In applying the aforementioned law to the facts of that case the Court said:

> Mansfield submitted a clear quotation which was reiterated both orally and in writing. *Mansfield should reasonably have expected* that quotation to be used in the preparation of the contract bid, *since it had notice* that its subcontract bid was substantially lower than the other bids received by Meade. Although the *trial judge did not make a specific finding on* the question of *reliance* by Meade, we feel the *weight of the evidence* clearly *compels* a *finding* that *Meade did rely* upon Mansfield's offer. Therefore, we hold Mansfield liable to Meade for damages caused by Mansfield's refusal to honor its subcontract bid. (Emphasis added.) Id. at p. *106*

Thus, this Court in *Meade* said that the second prong, "reasonably foreseeable reliance," had taken place if (1) [to paraphrase] Party A should reasonably have expected Party B's reliance since Party A had "notice" that Party A's bid was lower; and also if (2) this Court decided (despite the lack of such specific finding by the trial judge) that the weight of the evidence compels a finding that Party B did rely on Party A's actions.

As to whether reasonably foreseeable reliance had taken place in this case we must apply the factors set out in *Meade*. Using *Meade's* first general test for "reasonably foreseeable reliance" we must determine whether Monarch should reasonably have expected Finney's reliance since Monarch (and Finney as well) had "notice" that Monarch's bid (and Finney's bid as well) was lower. In *Meade* the answer to the question posed in a like language was: yes, "reasonably foreseeable reliance" had occurred.

I point out that this Court in *Meade* did *not* require that the "notice", which provoked the reasonably foreseeable reliance by one party upon another and which flowed between the subcontractor and the general contractor, either necessarily or specifically be in the form of a direct communication between the sub and the general. The Court only said that a party " ... should reasonably have expected ... [the reliance] ... since it had notice that its bid was ... lower ...." In addition, the facts as described in the opinion do not clarify or specify whether the sub's first notice was or was not directly from the general contractor.

We should also recognize the fact that the notice which provoked the "reasonable foreseeable reliance" in *Meade* and upon which the issue turned in *Meade* was *not* generated by the subcontractor's submission of a bid. Rather, the notice in *Meade* came *during* the bidding process. This is significant because the *Meade* court found a binding contract to exist based upon notice sufficient enough between the parties to engender reasonably foreseeable reliance by one party upon another party at a point in the bidding process where a traditionally or "regularly" communicated acceptance had not yet taken place.

Furthermore, apparently in the present case there was "notice" flowing from several sources of Monarch's reliance upon Finney's bid. According to the affidavit of Ben Finney, by 4:30 p.m. of February 5, 1981, the day that the bids were opened at 2:00 p.m., Finney Company had been told by "the state" over the telephone and by Mr. H.V. Staggs of Staggs & Fisher, the consulting engineers on the project, that Monarch had chosen and listed Finney Company as the mechanical contractor. According to the rationale of the *Meade* decision, a party should reasonably expect reliance upon notice that a bid is lower. Certainly, Monarch received notice that Finney's bid was lower, Finney, likewise, received notice that its bid was lower, and they both received notice that Monarch's bid was the lowest. Therefore, under the law in *Meade*, the two contractors should "reasonably have expected" each other's reliance upon those communicated facts, i.e. upon that "notice".

Under *Meade* to prove "reasonably foreseeable reliance" it must be found that

Party B did rely on Party A's actions. The facts are abundant to unequivocally prove Finney's reliance upon the actions of Monarch. The facts also prove that Finney's reliance took place after it received "notice" of the kind deemed sufficient in *Meade.* Ben Finney's affidavit states facts that show that on February 5, 1981, Finney Company received first notice that Monarch was the low general contractor bidder and that Finney Company was the low subcontractor mechanical bidder. Mr. Finney's affidavit alleges that on February 12, 1981, February 24, 1981 and March 2, 1981, Finney Company refrained from bidding on three major construction projects and that as a result of Monarch's actions Finney also incurred expenses of approximately $19,600 for purchases of equipment to be used on the Monarch project. Surely a jury should have had a chance to determine if these facts prove that Finney did rely on Monarch's actions.

But even more than all of this, the *Meade* concept of reasonably foreseeable reliance could arguably also have arisen as a result of custom in the construction industry. Two allegations exist in this record which are sufficient to, at the very least, raise an issue as to whether the custom in the construction industry is that once a general uses a sub's bid then the general considers itself bound to the sub. Obviously such a custom in the industry would produce reasonably foreseeable reliance by the sub and would thus fulfill the *Meade* standard.

The first of these allegations is that Monarch's use of Finney's bid coupled with additional facts tended to prove an acceptance by Monarch. The additional facts are that: (1) Monarch listed Finney in the contract executed by Monarch and the Commonwealth on February 19, 1981 which was two weeks after the bid opening and one week after Monarch had received Finney's written conformation of its bid; (2) Finney attended the pre-construction conference on March 2, 1981 without apparent objection from Monarch; (3) Ben Finney's allegation # 3 on page one of his affidavit:

That bid shopping by a general contractor after being awarded a prime contract is considered to be an unethical practice within the standards of the construction industry generally and locally.

The second of the two major allegations which is sufficient to raise a jury issue about whether custom in the industry would indicate reasonably foreseeable reliance and/or that a binding contract existed between Finney and Monarch is that Finney alleged that at the pre-construction conference, Mr. Boyer Moore of Johnson-Romanowitz, the architects, Mr. H.V. Staggs of Staggs & Fisher, the consulting engineers on this project, and Mr. Keith Abbott of the Division of Engineering for the state, emphasized in response to the voiced concerns of Finney and other listed subcontractors that "... all listed subcontractors were a part of the contract with Monarch and could not be changed unless a letter of release was obtained from the subcontractors."

To conclude this examination of the second *Meade* test prong, "reasonably foreseeable reliance", I reiterate that (1) the application of the general test established in *Meade* for determining if "reasonable foreseeable reliance" had occurred plus (2) the fact that *Meade* did not require direct "notice", plus (3) the fact that *Meade* considered notice received during the bidding process to be sufficient for establishing reasonably foreseeable reliance plus (4) the facts that show Finney did rely upon Monarch's actions plus (5) substantial allegations of industry customs that could be a credible basis for finding reasonably foreseeable reliance coupled with (6) a well reasoned precedent for allowing the admission of evidence of industry custom all amounts to certainly enough to not only compel, but to mandate that the *Meade* second prong issue, that is, whether Monarch could reasonably have foreseen that Finney would rely on Monarch's action, should at the very least have been submitted to the jury.

The first prong from the *Meade* test, the "fairness and equity" standard also com-

pels a resubmission of this case for trial if not an outright reversal of it. In *Meade* we found a binding contract based in part upon "fairness and equity". Surely, fairness and equity came into play in this situation to an equal or even greater extent than they did in *Meade*. In *Meade* fairness and equity were applied to reach the result when the case was a relatively clear cut contract bidding dispute. Here, however, the dispute wallows in the highly questionable practice of bid shopping.

It appears that here one party used inequitable advantage that antiquated law has given to it in order to dangle the not so advantageously situated party by a thread. The party with the unreasonable advantage keeps the less fortunate party suspended in an untenable position until it chooses to either hoist him up or unexpectedly cut him loose to plummet. The less fortunate party is left seriously damaged but without recourse.

Because Finney was bound to perform at Monarch's call, Finney was required to be ready to start work at Monarch's command. This meant Finney had no choice but to purchase needed equipment and to refrain from bidding on other jobs in order not to tie up its workers, equipment and capital so that they were available at a moment's notice of work on the Monarch project. Yet, we have decided that despite these obligations imposed upon Finney, Monarch is free to dismiss Finney from the project, without cause, standard of "fairness and equity" all the more important. If ever there was a situation that called for the application of "fairness and equity" this is it. I regret that it has not been implemented.

At the very least this case should have been reversed and remanded to the trial court for a trial on the merits.